UNITED STATES of America, Appellee,

v.

**Pedro Fernando CHUNZA–PLAZAS, Defendant–Appellant.**

No. 366, Docket 94–1009.

United States Court of Appeals, Second Circuit.

Argued Nov. 10, 1994.

Decided Jan. 23, 1995.

Mark B. Gombiner, The Legal Aid Soc., Federal Defender Div. Appeals Bureau, New York City, for defendant-appellant.

Jodi Levine Avergun, Asst. U.S. Atty. for the E.D. of N.Y. (Zachary W. Carter, U.S. Atty. for the E.D. of N.Y., Susan Corkery, Asst. U.S. Atty., of counsel), for appellee.

Before: FEINBERG, KEARSE, and PRATT, Circuit Judges.

PRATT, Circuit Judge:

## BACKGROUND

On March 26, 1993, agents of the Drug Enforcement Agency ("DEA") and the Immigration and Naturalization Services ("INS"), acting on a tip from the Colombian National Police, went to the Staten Island home of Pedro Fernando Chunza–Plazas, a retired Colombian police officer. Chunza identified himself as Fernando Chunza and allowed the agents to enter his home.

Chunza consented to a search of his home, and the agents found two fraudulent alien-registration cards in the names of Pedro Fernando Chunza and Jose Gonzalez, and two counterfeit social-security cards in the names of Jose Gonzalez and Pedro F. Chunza. Under questioning, Chunza acknowledged his possession of the documents and admitted that on October 5, 1990, he had illegally entered the United States by using a false passport.

A grand jury returned a six-count indictment charging Chunza with two counts of possessing fraudulent alien-registration cards, two counts of possessing unlawfully produced social-security cards, and two counts of possessing false social-security cards with the intent to defraud the United States. On June 25, 1993, Chunza pled guilty to the two counts of possessing fraudulent alien-registration cards.

The probation department determined Chunza's base offense level to be 6, and reduced that from 6 to 4 for accepting responsibility. U.S.S.G. § 3E1.1. With a criminal history category of I, Chunza's guideline range was 0–6 months.

By letter dated September 30, 1993, the government moved under U.S.S.G. § 5K2.0 and § 5K2.9 for an upward departure to five years, claiming that Chunza's "motivation in obtaining and using the false green cards constitutes an 'aggravating * * * circumstance of a kind or a degree, not adequately taken into consideration by the Sentencing Commission.'" The government's motion sought a *Fatico* hearing, so that it could prove that Chunza, "while a member of the Colombian National Police, acted as a paid assassin and security guard for the Medellin Colombian cocaine cartel [then] run by Pablo Escobar Gaviria." The letter also stated that Chunza's criminal activities on behalf of Escobar led to Chunza's discharge from the Colombian police and to the issuance of arrest warrants for homicides, drug trafficking, and assault. The government concluded that Chunza "left Colombia to avoid prosecution for the acts he committed on behalf of Escobar" and that Chunza used the green cards "to conceal his past crimes in Colombia", which, it claimed, were "relevant to his sentencing".

At the *Fatico* hearing, the government called three witnesses: (1) an anonymous

former Colombian judge, (2) Carlos Arredondo, and (3) DEA Special Agent Sam Trotman.

The anonymous judge, a current member of the Prosecutor General's Office in Colombia, testified about the issuance of four warrants for Chunza's arrest in Colombia. Three of the four were military warrants; the fourth was a civilian warrant.

Two of the three military warrants were for homicide; the third charged Chunza with "personal injuries to an individual." The military warrants were all dated March 26, 1993, the day Chunza was arrested in the United States. The two homicide warrants failed to state the names of the victims, the dates, or the places of the alleged crimes. The other military warrant stated that the crime had occurred on May 12, 1990, but it did not identify the type of offense, the victim, or the place where the alleged act occurred. When the former judge was cross-examined about the lack of information in the warrants, he explained that it was not the custom in Colombia to include this information and it was not required by law. The witness also did not know the basis for issuing one of the warrants. He also could not explain why the warrants had not been issued until March 26, 1993, even though Chunza had left Colombia in October of 1990.

The anonymous judge testified that the civilian warrant was based on the statements of Jhon Jairo Posada Valencia and a "witness with [an] undisclosed identity" who had personal knowledge about Chunza's activities for Escobar. Neither of these written statements had been made to the anonymous judge; they were made to another Regional Prosecutor.

When questioned about Posada's statement, the anonymous judge testified that it had not been given under oath but was part of a penal or criminal proceeding. The anonymous judge also acknowledged that when Posada was questioned in his statement about Chunza, he had denied any personal knowledge of Chunza's activities and did not know who Chunza was.

The other statement underlying the civilian warrant, the one by the "witness with [an] undisclosed identity," indicated (1) that Chunza had participated in homicides and kidnappings in Colombia on behalf of the Medellin cartel as recently as February 1993, less than two months before Chunza was arrested at his Staten Island home, and (2) that the last time he had seen Chunza, "[Chunza] was with five guys with rifles R–15, that was one month and twenty days ago, that is, at the beginning of February of this year [1993]", in Medellin. The unidentified witness also provided the only evidence that even hinted at any possible drug activity by Chunza in the United States after he came here in 1990. The unidentified witness said:

> I knew that a *report was issued* by Universal (illegible) *stating that DARWING,* CARRO VIEJO's brother *said that* the doctor, that is PABLO *ESCOBAR, planned to send somebody* he trusted very much to the United States to collect some money and (illegible) *and the person named* to do that *was CHU[N]ZA,* because he was the only one left, the most trusted at that time, I (illegible) this comment more or less the last time I saw him, that is, at the beginning of February [1993]

(emphasis supplied). There was no corroboration to this third-level hearsay, and neither the unidentified witness nor anyone else provided evidence that Chunza had actually come here to collect money.

Although the unidentified witness did not explain how he knew about Chunza's alleged criminal activities, he did state, "[S]ometimes we were eighty people, we met to smoke marijuana, to be vicious, even Pablo [Escobar] was there, including people from the Jail of Itagui, I know this because I earned the trust of Carro Viejo and I went there as his friend." And again, "I met (illegible), his last name was Durango and Pablo Escobar ordered his death and he is buried near doctor Carlos Mauro Hoyos, as their friend they talk to me about things and I realized some of [the] things they were doing which is what I am telling now."

The second witness at the *Fatico* hearing, Carlos Arredondo, a confessed member of the Medellin cartel, testified about Chunza's activities in Colombia. In July of 1992 Arredondo came to the United States to collect

drug money, but he was soon arrested for transporting twenty kilos of cocaine in his car and was sentenced to ten years to life in prison. After Arredondo pled guilty, he cooperated with the government and agreed to testify at the *Fatico* hearing in hopes of receiving a 5K1.1 letter.

At the hearing, Arredondo claimed that he had first heard of Chunza in September of 1988, when Fernando Galeano, an important member of the Medellin drug cartel, had employed Arredondo to help in the search for Galeano's father who was kidnapped by guerrillas. Escobar recommended to Galeano that Chunza could help locate Galeano's father. During the sixty-to-seventy-day search for Galeano's father, Chunza frequently met with Galeano. After Galeano's father was found, Galeano employed Arredondo as one of his bodyguards.

Still working for Galeano in 1989, Arredondo participated in a cocaine transaction at which, he said, Chunza was present. Arredondo and Galeano flew to Dorado to meet with Escobar. At the runway, Chunza was seated in one of the two cars. Arredondo contended that Galeano spoke with Chunza and that Chunza directed Arredondo while loading 300 kilograms of cocaine from the car on to Galeano's plane.

Arredondo also described Chunza's alleged role in the death of two Colombian police officers who attempted to assassinate councilman Alvares Henao ("Henao"). According to Arredondo, when Galeano learned that certain policemen were planning to kill Henao, Galeano hired Chunza to investigate and kill the police officers who were threatening Henao's life. Arredondo claimed to have learned this information from other people.

The government's third witness at the *Fatico* hearing was D.E.A. Agent Sam Trotman ("Trotman"), the case agent in charge of the prosecution of Escobar and Danny Munoz Mosquera for "cocaine trafficking, international terrorism, * * * murder, Rico". Trotman testified that he had interviewed an unnamed paid informant who was a former member of the Medellin cartel. Trotman was unaware of where the informant was at the time of the hearing. However, after speaking with controlling agents in Bogota, who had independently corroborated information from this informant in the past, Trotman believed this informant to be a reliable source.

The paid informant had said that a hit man named "Popi" told him that Escobar had ordered Chunza to obtain the passenger manifest for Avianca Airlines flight 203, which was later blown up. "Popi" was never identified, and there was no testimony as to how the hit man knew what Escobar had told Chunza to do, or whether Chunza ever did it. The informant also had reported that Chunza had given information to Escobar about the movements of Colombian troops, but Trotman acknowledged that the informant did not have any factual basis for this allegation.

Trotman also testified that he had interviewed another informant who worked for Kiki Moncada, a major drug dealer. This informant had stated that Chunza was a confidant of Gustavo Gaviria, Escobar's cousin, and that Chunza had been at Escobar's ranch several times. But the informant had neither met nor spoken to Chunza. During cross-examination, Trotman admitted that he had no knowledge that Chunza had participated in any criminal activities in the United States. Trotman also acknowledged that Chunza was not named in the indictment concerning the Avianca bombing.

After the *Fatico* hearing, the government renewed its motion for an upward departure from 0–6 months to a five-year sentence. The government contended that based on the evidence at the *Fatico* hearing, "it has been established by a preponderance of the evidence that Chunza was a member of the Medellin [c]artel, committed criminal acts at the behest of Pablo Escobar, and came to the United States both to assist Escobar in collecting money owed to the [c]artel and to avoid further prosecution in Colombia related to his activities in the [c]artel." The government argued under § 5K2.9, that these were the motivating factors in Chunza's illegal possession of the false immigration documents, and that possession of the false green cards had allowed him to conceal his involvement in the Medellin cartel.

The government also contended that an upward departure should be made under U.S.S.G. § 4A1.3 because it had proved the "defendant's participation in at least one murder, one incident of cocaine trafficking and one instance of terrorism." As a result, the prosecutor argued, Chunza's sentence should be based on a criminal history category of IV instead of I, because Chunza "is in a position akin to defendants who have three prior convictions resulting in three separate sentences of more than a year" and an offense level of 20, which would yield a guideline range of 51 to 63 months.

At sentencing, Gino Singer, Chunza's counsel, objected to any upward departure. In answer to the government's argument that a departure was justified under U.S.S.G. § 4A.1.3, he stressed that Chunza had no prior criminal convictions. Singer also argued that any pending criminal proceedings against Chunza for crimes allegedly committed in Colombia should be punished in Colombia, not in this proceeding. He pointed out that under § 4A.1.3, an upward departure cannot be grounded upon uncharged and unsentenced allegations of foreign criminal conduct. In response, the prosecutor argued that Chunza's lack of prior convictions was irrelevant because the court could "consider prior similar adult criminal conduct not resulting in a criminal conviction."

The government also argued that a departure was appropriate under § 5K2.9, because Chunza had committed the false registration offense in order to facilitate or conceal the commission of his offenses in Colombia. In opposition, Singer contended that there was "absolutely no evidence" showing that Chunza was in the United States to collect drug money on behalf of Escobar. The presentence report revealed that Chunza has lived in the United States for a few years and has worked in several entry-level positions. In response to the unidentified witness's testimony that Chunza had come to the United States to collect money for Escobar, Singer urged that this testimony was unreliable because it was "remote hearsay."

Singer also objected to basing an upward departure on the allegation that Chunza had come to the United States to escape prosecution in Colombia. None of the arrest warrants for Chunza was issued until after he arrived in the United States. Singer contended that Chunza had fled to the United States because of attempts on his life, a claim that was supported by newspaper articles and letters that Chunza had sent to the Colombian authorities. The government admitted that it had inferred that Chunza had come to the United States to avoid prosecution, because it believed, without sufficient evidence, that the three arrest warrants for Chunza had been issued or authorized before he left Colombia. However, the government was wrong, because the warrants were not issued until nearly two-and-one-half years later, in March 1993.

After hearing the arguments of both counsel, Judge Nickerson agreed with the government and stated that

it seems to me that certainly by a preponderance of the evidence Mr. Chunza was a member of the Medellín Cartel. He committed criminal acts at the behest of Mr. Pablo Escobar and came to the United States both to assist Escobar in collecting money—and I think it's a fair inference that he also came to the United States to avoid further prosecution. It's a fair inference even if the warrants were issued afterwards that he knew he was going to be subject to prosecution.

The judge found that this evidence warranted upward departures, to criminal history category IV and offense level 20, so he sentenced Chunza to two, concurrent, five-year prison terms, three years' supervised release, and a $100 mandatory special assessment. Chunza argues that his criminal history category and offense level were improperly increased and that his sentence should therefore be vacated.

### DISCUSSION

The central argument of Chunza's appeal is that an upward departure from his 0–6 months guideline range could not properly be based on foreign criminal conduct of which he had not been convicted.

## A. Criminal History Category

■ The district court's reliance on Chunza's activities in Columbia was an improper basis for increasing Chunza's criminal history category. Chapter IV of the sentencing guidelines addresses defendants who have a record of past criminal conduct.

Under § 4A1.1, a defendant's record of prior *sentences* is relevant to determine a defendant's criminal history category. Section 4A1.1 provides: "[T]he total points from items (a) through (f) determine the criminal history category in the Sentencing Table in Chapter Five, Part A." Items (a) through (f) all mention adding a specific number of points either for each prior *sentence* of imprisonment or for committing the crime shortly after or while on release from a *sentence.* Section 4A1.2(1) defines prior sentence as "any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendre,* for conduct not part of the instant offense."

Chunza, however, had never been sentenced or convicted in the United States, Colombia, or elsewhere. As a result, § 4A1.1 of the guidelines did not authorize consideration of Chunza's other conduct in the calculation of his original history category.

■ The guidelines also give special attention to the role of foreign convictions and sentences in determining criminal history category. Section 4A1.2(h) provides: "Sentences resulting from foreign convictions are not counted", but they may be considered under § 4A1.3 (Adequacy of Criminal History Category). That section, in turn, permits an upward departure in the guideline range, suggesting the type of "reliable information" that might be used:

(a) prior *sentence(s)* not used in computing the criminal history category (*e.g.*, *sentences* for foreign and tribal offenses);

(b) prior *sentence(s)* of substantially more than one year imposed as a result of independent crimes committed on different occasions;

(c) prior similar misconduct established by a civil *adjudication* or by a failure to comply with an administrative *order;*

(d) whether the defendant was *pending trial* or *sentencing* on another charge at the time of the instant offense;

U.S.S.G. § 4A1.3 (emphasis added). Thus, not even foreign sentences may be used initially in determining the criminal history category, but they may be used, like a pending charge, as the basis for an upward departure. In light of these precise provisions as to how charges and foreign sentences may be used, it is significant that nowhere do the guidelines specifically authorize the use of unrelated, uncharged foreign criminal conduct, or even foreign arrests, for a departure in the criminal history category.

Thus, there was no appropriate foundation for an upward departure under the first four subdivisions of § 4A1.3. The only other express possibility for raising Chunza's criminal history category is under the fifth subdivision, subsection (e), which suggests that the court might consider "reliable information" about "(e) prior *similar* adult criminal conduct not resulting in a criminal conviction." U.S.S.G. § 4A1.3(e) (emphasis added).

■ Even assuming that subsection (e) might reasonably be extended to include criminal conduct in a foreign country, a court might properly consider that conduct only if it is "similar" to the crime of conviction. Chunza's alleged prior acts of homicide, terrorism, and drug trafficking in Colombia are not "similar" to his possession of false immigration documents in the United States.

Chunza distinguishes his situation from *United States v. Mayo,* 14 F.3d 128, 131 (2d Cir.1994), where we held that the district court did not err in increasing the defendant's criminal history category based on similar prior conduct. We recognized that while "prior conduct need not have been of an identical type" for an upward departure, it must have been similar. *Id.* We found that the defendant's prior arsons committed to prevent the auditing of his financial records were fraudulent conduct that was similar to the frauds underlying the convictions and that this warranted an upward departure, because "the difference between a fraud designed to obtain loans in the first place and a fraud designed to avoid their repayment is a

variation that does not bespeak dissimilarity." *Id.* at 132.

In contrast here, however, Chunza's alleged acts of terrorism, homicide, and drug dealing in Colombia were not similar to his possessing false U.S. immigration and social-security documents in Staten Island. The government seeks to treat Chunza's activities in Colombia as similar to possessing the false documents by arguing that he came to the United States to avoid punishment for his misdeeds in Colombia and to pursue his criminality on behalf of the Medellin cartel, and that he used the documents to "legitimize" his presence here. The argument lacks force for two reasons. First, the arrest warrants were not issued until March of 1993, after Chunza had been in the United States for more than two years, and the government presented no additional evidence that Chunza had fled Colombia two years earlier to avoid prosecution there. Second, § 4A1.3(e) requires conduct that is "similar" to the convicted conduct, not conduct that was designed to further other, dissimilar, criminal conduct.

The government also argues that even if Chunza's acts in Colombia were dissimilar to his possessing false green cards, our decision in *United States v. Diaz–Collado*, 981 F.2d 640, 644 (2d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2934, 124 L.Ed.2d 684 (1993), authorizes a departure based on nonsimilar prior criminal conduct. *Diaz–Collado*, however, dealt with convictions, not conduct. *Id.* As we then noted, "under certain circumstances nonsimilar outdated *convictions* may be used as a basis for departing from the [g]uidelines." *Id.* (emphasis added). Here, we reject the government's attempt to extend *Diaz–Collado* to authorize use of nonsimilar conduct that did not result in a conviction.

### B. *Offense Level*

■ Chunza also contends that the district court erred in departing upward 16 levels on his offense level.

In *United States v. Azeem*, 946 F.2d 13, 16 (2d Cir.1991), the defendant claimed that his heroin activities in Egypt should not have been counted in fixing his base offense level

because (1) they were not part of the same conspiracy of which he was convicted and (2) the heroin transaction in Egypt was not a crime against the United States. On the first claim, we held that the district court did not err in finding the Egyptian conspiracy was part of the same crime as Azeem's offense of conviction in the United States. On the second count, however, we held that the Egyptian transaction "should not have been included in the base offense level calculation because it was not a crime against the United States." *Id.* We further reasoned that

> Congress, while it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited role * * * [t]here are good reasons to avoid creating a new use for foreign crimes in sentencing. To do so would require distinguishing between activities that violate both domestic and foreign law and those which violate only domestic law or only foreign law. * * * To permit foreign crimes to figure in fixing the base offense level would require courts to perform a careful comparative analysis of foreign and domestic law in such instances. At some point the advantages of simplicity should prevail.

*Id.* at 17. Finally, we held

> [w]ithout a clear mandate from Congress, we decline to create the complexities that the inclusion of foreign crimes in the base offense level calculation would generate. These issues are best considered and resolved by Congress.

*Id.* at 18. Although we are confident that homicide is prohibited by both domestic and Colombian law, we are less certain that courts in the United States are in a good position to assess the reliability of Colombian arrest warrants.

The same considerations considered in *Azeem* with respect to base offense level, should guide our determination of whether Chunza's conduct in Colombia may be considered for an upward departure. Like Azeem's Egyptian conspiracy, Chunza's illegal activities in Colombia were not crimes against the United States, and therefore should not be included in the guideline calculation. Moreover, while Azeem's Egyptian

heroin conspiracy was viewed as part of the same course of conduct underlying his United States activity, Chunza's possession of the fraudulent registrations and the counterfeit social-security cards was not part of the same crimes as committing homicide and terrorist acts for the Medellin cartel in Colombia. Thus, the reasons for excluding consideration of Chunza's foreign conduct are even stronger than the circumstances in *Azeem*.

The government finally seeks to justify the upward offense level departure under § 5K2.9. That section states:

> If the defendant committed the offense in order to facilitate or conceal the commission of another offense, the court may increase the sentence above the guideline range to reflect the actual seriousness of the defendant's conduct.

U.S.S.G. § 5K2.9. The government asserted two contradictory views of the evidence in its zeal to show that both parts of § 5K2.9 ("facilitate or conceal") applied to Chunza. First, the government contended that Chunza's possession of the false documents was designed to facilitate the commission of another offense—coming to the United States "to assist Escobar in collecting money." Second, the government argued that the court should upwardly depart because Chunza had fled from Colombia to the United States to avoid prosecution for the crimes committed in Colombia.

The government's two theories are irreconcilable. If Chunza had come to the United States in 1990 to escape prosecution, he would not have been working for Escobar in Colombia in February of 1993. If Chunza was in Colombia in February 1993, as revealed by the evidence submitted by the government in support of its facilitation theory, planning to come to the United States to collect money for Escobar, he could not at the same time have been hiding out here in the United States. Other than the triple-hearsay statement of the unidentified witness, about the unexplained "Universal" report, the government lacks evidence to support its money-collection theory, and it admits that it does not have proof that Chunza came to this country to avoid prosecution. While it originally inferred that Chunza was wanted by the Colombian authorities, in 1990, when he came to this country, it finally conceded that the arrest warrants were issued against him only in March of 1993, more than two years after he left Colombia.

Chunza's conduct in this country was manifestly inconsistent with that of a person hiding from the authorities; the government did not produce any reliable evidence to show that Escobar actually sent Chunza to the United States to collect money for him; the only evidence of a possible drug-related crime in the United States was the triple-hearsay statement of the "witness with [an] undisclosed identity". Although a sentencing court may consider hearsay, the uncorroborated evidence offered here neither rises to an acceptable standard of reliability, nor establishes that Chunza ever collected any money for Escobar. Thus, the 16–level upward departure in offense level under § 5K2.9 was improper.

## CONCLUSION

We vacate the sentencing court's upward departure from 6 months to 60 months, which was based on unrelated foreign conduct and insufficient triple-hearsay testimony about Chunza's being sent here to collect money for Escobar.

Remanded for resentencing consistent with this opinion.