### UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

#### v.

### Honore Fred FAROUIL, Defendant–Appellant, Cross–Appellee.

#### Nos. 96–2227, 96–2478.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 19, 1997.

Decided Aug. 26, 1997.

George Jackson (argued), Barry Rand Elden, Chief of Appeals, Office of the United States Attorney, Criminal Appellate Division, Chicago, IL, for Plaintiff–Appellee, Cross–Appellant.

Nan R. Nolan (argued), Chicago, IL, for Defendant–Appellant in No. 96–2227.

Micky Forbes, People's Law Office, Chicago, IL, Nan R. Nolan (argued), Chicago, IL, for Defendant–Appellee in No. 96–2478.

Before POSNER, Chief Judge, ROVNER and EVANS, Circuit Judges.

ILANA DIAMOND ROVNER, Circuit Judge.

Honore Fred Farouil was convicted by a jury of knowingly importing heroin into the United States in violation of 21 U.S.C. § 952(a). He appeals his conviction and his sentence, contending that the district court erred in (1) refusing to suppress certain post-arrest statements; (2) instructing the jury on the government's conscious avoidance theory; (3) determining the amount of heroin attributable to him; (4) denying him a downward departure; and (5) refusing to apply the safety valve provision under 18 U.S.C. § 3553. The government cross appeals, challenging the three-level reduction the trial court allowed for Farouil's role in the offense. We affirm the conviction, but vacate and remand the sentence because we agree that the court erred in granting the three-level reduction for Farouil's minor role in the offense, and also because the court misapprehended the extent of its discretion when it refused to depart downward.

## I.

On February 17, 1994, airport officials in Brussels, Belgium searched the luggage of Helene Alexis, who was attempting to board an American Airlines flight to Chicago. After discovering heroin in the lining of Alexis' carry-on bag, an airport security officer alerted customs officials in Chicago that they had arrested Alexis and that she had been traveling with two men who were bound for Chicago, Honore Fred Farouil and Moucharafou Mounirou. Based on this information, customs officials met the plane at Chicago and observed Farouil and Mounirou from a distance. Customs Agents Timothy, Gallowitch and Stewart all observed Farouil approach the baggage carousel, and then turn to leave without claiming his checked luggage. Agent Timothy approached Farouil at this point and asked whether he had any luggage to claim. Farouil indicated that the garment bag he was carrying was the only luggage he had, and Agent Timothy escorted him to an inspection area in order to search the bag.[1] When Agent Timothy reached inside the bag, Farouil attempted to zip the bag closed. Agent Timothy then emptied the bag and discovered three suit jackets that were unusually heavy. The empty bag was also suspiciously weighty. Upon inserting a probe into the lining of the jackets and the

---

1. Customs agents had already determined that Farouil had, in fact, checked a suit case. No contraband was discovered in the checked suit case.

bag, Agent Timothy discovered a white powdery substance that field-tested positive for heroin. All tolled, the garment bag and suits contained 7.53 kilograms of heroin. Farouil was then arrested.

In their first attempt to question Farouil, the customs agents quickly determined that Farouil, a French citizen, could not understand English, and they terminated the interview. In their second attempt, they sought assistance from Roberto Cardona, a Department of Aviation employee who spoke some French. Because of Cardona's limited knowledge of French and because he spoke French with a strong Spanish accent, the interview again proved unsuccessful and was terminated quickly. The agents then brought in Leslie Hirsch, an Air France employee who was fluent in French, to translate. Although Ms. Hirsch did not specifically recall reading Farouil his *Miranda* rights, two agents present at the interview recalled reading a waiver of rights form to Ms. Hirsch, who translated the statements into French for Farouil. The agents further recalled that Farouil indicated he understood the waiver of rights form and that he signed it before they proceeded with the interview.

In the course of the interview, Farouil made several incriminating statements. He indicated that an unknown man had given him the bag when he was at an airport in Lome, Togo. He told the agents the man offered to pay him $5000 to carry the bag to Chicago, and directed him to go to the cab stand outside the International Terminal, where he would be approached by a man named Philip. If Philip did not show up, Farouil was to take the bag to the Chicago Hotel and wait for further instructions.[2] The man told Farouil that he was selecting him for this job because Farouil had a French passport, which would arouse less suspicion. At the conclusion of the interview, the agents directed Farouil to walk out into the passenger terminal, while they kept him under surveillance, to see if he would be contacted by Philip. No one approached Farouil during that time.

At trial, Farouil sought to suppress his postarrest statements on the grounds that he did not knowingly and voluntarily waive his *Miranda* rights. According to Farouil, Ms. Hirsch never read him his rights, and he signed the waiver of rights form during the interview session with Cardona, because he believed it to be a "cooperation" form. After an evidentiary hearing, the trial court declined to suppress the statements. Farouil also challenged the district court's decision to give a conscious avoidance instruction (also known as an "ostrich" instruction) to the jury, arguing that the government presented an insufficient factual basis for such an instruction. Farouil was convicted by a jury and sentenced to 135 months incarceration. In calculating the base offense level, the trial court attributed to Farouil the heroin found in his bag as well as the 4.5 kilograms of heroin that were confiscated from Alexis at the time of her arrest at the Brussels airport. Farouil requested that the court depart downward because he was a deportable alien and thus would be ineligible for home detention, community confinement, work release, or intermittent incarceration, and could not serve any of his sentence in a minimum security prison. The court declined to depart downward, and further found that Farouil was ineligible for the safety valve provision of 18 U.S.C. § 3553(f). The court awarded Farouil a three-level reduction for his role in the offense, which the court characterized as falling between that of a minimal participant and that of a minor participant.

## II.

On appeal, Farouil challenges the district court's denial of his motion to suppress his postarrest statements, arguing that Hirsch was the only person who spoke his language and that she had no recollection of reading him his rights. Farouil also contests the district court's decision to give the conscious avoidance or "ostrich" instruction, claiming that the evidence was insufficient to create a factual predicate for the instruction. Farouil raises three issues relating to his sentence. First, he claims the district court erred in attributing to him the heroin confiscated from Alexis because her offense was not a

---

2. Investigators later verified that there is no "Chicago Hotel" in Chicago.

crime against the United States. Second, he contends the district court erred as a matter of law in limiting the grounds on which it could grant a downward departure, and in particular erred in finding that it had no authority to depart downward on the basis of Farouil's status as a deportable alien. Finally, Farouil claims the court erred in finding that he did not qualify for the safety valve provision.[3] The government cross-appealed the sentence, challenging the three-level reduction the court allowed to account for Farouil's role in the offense. The government argues that the record contains no support for the court's finding that Farouil's role in the offense was between minimal and minor.

## A.

■■■ We review *de novo* the district court's denial of Farouil's motion to suppress his post-arrest statements. *Ornelas v. United States,* — U.S. —, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996); *United States v. Mills,* 122 F.3d 346 (7th Cir.1997) (applying *Ornelas* to the review of voluntariness of waiver of *Miranda* rights). We review deferentially the findings of the trial court with respect to historical facts that underlie the issue of voluntariness. *Mills,* 122 F.3d at 348–50; *United States v. D.F.,* 115 F.3d 413, 417 (7th Cir.1997). But following *Mills,* we review de novo the ultimate issue of voluntariness of waiver of *Miranda* rights. *Mills,* 122 F.3d at 351. With those standards in mind, we examine the evidence presented at the suppression hearing.

■■ Farouil told a starkly different story at the suppression hearing than either of the customs officers present at the interview. According to Farouil, he signed the waiver of rights form at the urging of Cardona, believing it to be a "cooperation" form. Everyone agrees that Cardona and Farouil did not understand each other. But the agents testified that the interview terminated after Cardona's unsuccessful attempt to translate the form, and that Farouil did not sign the form

until Hirsch translated his rights to him in the third interview attempt. Hirsch testified at the suppression hearing that she did not specifically recall reading Farouil his rights, but nor did she recall that she failed to read him his rights. She testified that her usual practice when participating in interviews of this type is to apprise the suspect of his rights. She further testified that she was called upon to participate in criminal investigations approximately once a month. Farouil makes much of Hirsch's later testimony at trial that she had not seen the waiver of rights form until a week before trial when the prosecutor showed it to her. The customs agents explained that they read the form to Hirsch, who translated their words into French. According to the agents, Farouil indicated he understood each of the statements contained on the form, and that he agreed to waive his rights and continue with the interview. According to the agents, Farouil signed the waiver of rights only after Hirsch properly translated the entire form to him.

The district court found that Farouil was not a credible witness at the suppression hearing, that Hirsch was a "very credible, very believable witness," and that the agents were also credible witnesses. The court further found that Hirsch's lack of recollection was perfectly consistent with the testimony of the agents that they read the form to her and she translated the waiver of rights form to Farouil in this manner. The court specifically found that her lack of recall was not unusual in light of the fact that giving *Miranda* warnings in criminal investigations had become somewhat routine to her. Reviewing deferentially the district court's credibility determinations, we find no error in the court's conclusion that the agents read the waiver of rights form to Hirsch, who translated it to Farouil, who then signed with a full understanding of the document. Nor do we find error in the district court's rejec-

---

**3.** We find this contention has no merit. The district court was well within its discretion in finding that Farouil failed to satisfy the fifth requirement of the safety valve provision, that the defendant tell the government all he knows about the crime and related activity. The defen-

dant bears the burden of proving his entitlement to the safety valve reduction. *See United States v. Ramirez,* 94 F.3d 1095, 1099–1101 (7th Cir. 1996). Farouil offers us no reason to believe the district court erred in finding he did not meet this burden.

tion of Farouil's testimony that he signed the form in the presence of Cardona, believing it to be a cooperation form. We therefore accept the district court's determination of the historical facts underlying the issue of voluntariness.

Farouil cites *United States v. Cichon*, 48 F.3d 269 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 908, 133 L.Ed.2d 840 (1996), for the proposition that Hirsch's failure to recall advising him of his *Miranda* rights requires suppression of any statements he made during the Hirsch-assisted interview. The defendant in *Cichon* was interviewed by two special agents of the Department of Justice Division of Narcotics Enforcement following his arrest. One of the agents recalled that the other advised the defendant of his rights, but the other agent stipulated that he had no independent recollection of reading the defendant his rights. Based on that stipulation and other evidence presented, a federal magistrate recommended that the district court grant the defendant's motion to suppress his post-arrest statements.[4] The district court adopted the magistrate's report and recommendation and granted the motion to suppress. The suppression on *Miranda* grounds was not specifically appealed, although the defendant later challenged the failure of the district court to rule on his other suppression motion based on involuntariness. The appellate court affirmed the magistrate's finding that the statements were made voluntarily. *Cichon*, 48 F.3d at 274–76.

From this, Farouil argues that we must reverse the district court's finding that Hirsch read Farouil his *Miranda* rights. Yet, nothing in *Cichon* requires this result. On the contrary, in *Cichon*, the court made a credibility determination based on all the evidence before it, which included, in part, the agent's failure to recall reading the defendant his rights. No one challenged that credibility determination, and we would have granted it the same deference we must give to the district court's contrary fact findings here. The district court carefully considered Hirsch's lack of recall and in particular considered that this activity had become routine to her, that two credible customs agents spe-

cifically recalled the translation of the waiver of rights, and that Hirsch did not state that she affirmatively remembered not reading Farouil his rights. Unlike *Cichon*, the defendant here signed the waiver of rights form, further corroborating the testimony of the agents. The court also considered that Cardona and the agents testified that Farouil did not sign the form at Cardona's urging, as Farouil claimed, and in fact did not sign it in Cardona's presence. The agents testified that Farouil signed the form only after it had been translated to him in its entirety by Hirsch. Under those particular circumstances, the court ruled that Farouil was read his rights. The court here had considerably more evidence regarding the underlying facts than did the court in *Cichon*, and Farouil has offered no reason to find that the district court erred. Having accepted the district court's findings of fact, we further find that Farouil's waiver of *Miranda* rights was knowing and voluntary.

## B.

We review for abuse of discretion the district court's decision to instruct the jury on conscious avoidance. *United States v. Nobles*, 69 F.3d 172, 185 (7th Cir.1995). " 'The instruction should be given only when it addresses an issue reasonably raised by the evidence.' " *Id.* (quoting *United States v. Stone*, 987 F.2d 469, 471 (7th Cir.1993)). Thus, we have held that the instruction is appropriately given when the defendant claims a lack of guilty knowledge and there is evidence that supports an inference of deliberate ignorance or wilful blindness. *Nobles*, 69 F.3d at 185. We will review the evidence, along with the reasonable inferences that can be drawn from that evidence, in a light most favorable to the government. *United States v. Willis*, 61 F.3d 526, 533 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2528, 135 L.Ed.2d 1052 (1996). *See also United States v. Vega*, 72 F.3d 507, 516–17 (7th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 2529, 135 L.Ed.2d 1053 (1996). Farouil takes issue with the instruction in his case because, he contends, the government's only theory of the case was that Farouil had

---

4. The other evidence presented is not detailed in the court's opinion.

actual knowledge that his garment bag contained heroin. Farouil argues that he either knew (as the government contends) or did not know (as he contends) that his bag contained heroin. He claims there is no evidence giving rise to an inference that he deliberately avoided knowledge of the contents of the bag.

■ The government need not choose between presenting an actual knowledge case versus a conscious avoidance case to the jury. It may present both when the evidence so warrants. The circumstances here warrant the presentation to the jury of both theories, in the alternative. No one disputes that Farouil entered the United States with a garment bag full of drugs. Farouil implicitly agrees there was enough evidence to present an actual knowledge case to the jury. The only issue remaining is whether the evidence allowed an alternative inference that he consciously avoided knowing the contents of the bag. Farouil's claim during the Hirsch interview that an unknown man gave him the bag in the Lome, Togo airport, offered him $5,000 to carry the bag, and told him that his French passport would arouse less suspicion is more than enough to support an inference of conscious avoidance.[5] In fact, we agree with the government's characterization of these facts as a "textbook" example of conscious avoidance. Given these facts, the jury was free to infer that Farouil either knew the bag contained illegal substances, or had his head planted firmly in the sand to avoid knowing the contents of the bag. The instruction was therefore proper.

### C.

■ The first sentencing issue Farouil raises is whether the district court erred in attributing to him the drugs seized from Alexis when she was arrested in Belgium. The Sentencing Guidelines require the court to include in its calculation all acts that are part of the same course of conduct or common scheme or plan as the offense of conviction. U.S.S.G. § 1B1.3(a)(2). According to Farouil, a narcotics transaction that occurs

outside the United States cannot be included in the base offense level because it is not a crime against the United States. Farouil also contends there was insufficient reliable evidence to tie Alexis' drugs to him. Although we review the court's calculation of the drug amount for clear error, we review the court's legal interpretation of the Sentencing Guidelines de novo. United States v. Gonzalez, 112 F.3d 1325, 1328 (7th Cir.1997); United States v. Robinson, 96 F.3d 246, 252 (7th Cir.1996). We find no merit to Farouil's contention that there was insufficient evidence tying him to the drugs carried by Alexis, and thus we turn to his claim that the drugs may not be attributed to him because Alexis was not committing a crime against the United States.

Farouil cites two cases in support of his contention that Alexis' heroin should not be counted against him: United States v. Azeem, 946 F.2d 13 (2d Cir.1991) and United States v. Chunza–Plazas, 45 F.3d 51 (2d Cir.1995). Both cases are readily distinguishable from the instant case. In Azeem, the defendant was convicted of importing heroin into New York. In calculating the base offense level for his sentence, the district court attributed to the defendant an additional amount of heroin that had been transported from Pakistan to Cairo as part of the same international drug ring, but apparently not as part of any shipment destined for the United States. The appellate court reversed, holding that Congress did not intend to include in base offense levels crimes that were not committed against the United States. Azeem, 946 F.2d at 16–18.

Similarly, in Chunza–Plazas, the appellate court reversed an upward departure to the defendant's base offense level for conduct committed in Colombia. An arrest warrant had been issued in Colombia for the defendant, charging him with murder, terrorism and drug trafficking. The defendant was convicted in the United States of forging immigration papers. The appellate court found first that the defendant's crime of forging immigration papers was not part of the

---

5. Although Hirsch testified that Farouil never stated he was to receive $5000 to transport the bag, she did confirm the rest of the story. In any case, the court was entitled to credit the testimony of the customs agents who did recall the statement about the $5000 payment.

same course of conduct as the murder and drug trafficking activities in Colombia. That finding alone was enough to reverse the upward departure. The appellate court further found that the Colombian crimes were not committed against the United States and that the reliability of Colombian arrest warrants was difficult to assess. For all of these reasons, the appellate court found the district court erred in including these crimes in calculating the base offense level. *Chunza–Plazas*, 45 F.3d at 56–58.

The circumstances of Farouil's case stand in stark contrast to *Azeem* and *Chunza–Plazas*. Here, there is no doubt that Farouil's traveling companion was carrying illegal drugs, and that these drugs were intended for transport into the United States. Nor is there any doubt that Alexis' actions were part of the same scheme to import heroin of which Farouil was convicted. By mere fortuity, Alexis was arrested in Belgium and Farouil was arrested in Chicago. The evidence is clear that Alexis approached the American Airlines check-in counter with heroin-filled luggage in one hand and a ticket to Chicago in the other. Her drugs were destined for distribution in the United States, just as Farouil's were. Alexis' crime was, therefore, directed against the United States, unlike *Azeem* and *Chunza–Plazas* where the foreign crimes did not affect the United States and were not intended to affect the United States. *See United States v. Brown*, 549 F.2d 954 (4th Cir.1977), *cert. denied*, 430 U.S. 949, 97 S.Ct. 1590, 51 L.Ed.2d 798 (1977) (court had jurisdiction over trial on conspiracy to import heroin from Germany even though no element of conspiracy was committed within United States; otherwise usefulness of statute against importation would be greatly curtailed if it could not apply to crimes as easily committed on the high seas and in foreign countries as at home). We do not think the court erred in counting Alexis' drugs against Farouil in these circumstances.

### D.

Farouil next argues that the district court erred in refusing to grant him a downward departure based on his status as a deportable alien. Normally, we may not review the district court's exercise of discretion in refusing to depart downward. *See United States v. Murray*, 89 F.3d 459, 463 (7th Cir.1996). However, we may review a refusal to depart downward when that refusal is based on the court's erroneous belief that it had no discretion to depart. *United States v. Jackson*, 93 F.3d 335, 337 (7th Cir.1996). Not surprisingly, the parties dispute whether the district court's refusal to depart downward was a legitimate exercise of the court's discretion or the result of an erroneous belief that the court lacked discretion in this instance as a matter of law. We begin by reviewing the district court's comments at sentencing.

After noting that the court's discretion in sentencing has been "substantially circumscribed" by the guidelines, the court commented generally:

[W]hile I wish I had greater discretion, particularly in this case, I don't perceive that I have it other than what we have been discussing here. And I am aware of the fact that there are certain grounds for downward departure and the like, so I don't wish to be indicating that I feel that I'm forbidden to consider all of those matters. To the contrary, I have, and hope to make that clear in the articulation that I make.... I am bound by the sentencing guidelines, that I wish that there were greater ability to consider the personal circumstances of Mr. Farouil and other individual defendants. And I think to some extent over the years that may follow that that, hopefully, will come to pass, but we have to deal with the guidelines as they are at this time.

Transcript of Proceedings Before the Honorable John A. Nordberg, May 9, 1996, at p. 24. What the court meant by "what we have been discussing here" is open to interpretation. Both the government and the defendant had argued all of the sentencing issues to the court immediately before the court made this remark, so the remark conceivably applies to the court's perceived discretion to depart downward on the grounds that Farouil is a deportable alien.

But the court later specifically addressed the issue of downward departure based on

alien status. The court noted that although Farouil's deportable alien status meant he would be unable to take part in intermittent confinement, home detention or community confinement, he was also prevented from participating in those programs by virtue of falling into Guideline Range zone D. Thus, the conditions of confinement were not made harsher by Farouil's status as an alien, but rather by the seriousness of the offense he committed, at least in relation to these programs. The court did not address Farouil's claim that he would be ineligible to serve any part of his sentence in a minimum security facility, that his entire family resides in France, that he has no friends in the United States, that he will be unable to have any regular contact with his family or friends for an extended period of time, and that the cost to the United States of his incarceration will approach one half of one million dollars. Instead, the court elected to follow the Second Circuit's decision in *United States v. Restrepo*, 999 F.2d 640 (2d Cir.1993), *cert. denied*, 510 U.S. 954, 114 S.Ct. 405, 126 L.Ed.2d 352 (1993). In *Restrepo*, the court noted, a defendant's ineligibility to serve the last six months of his confinement in a halfway house, and inability to serve any of the sentence in a minimum security prison did not warrant a downward departure:

> [T]he court follows *Restrepo* in holding that [status as a deportable alien] is an inappropriate basis for departure, constituting an encroachment on the Bureau of Prison's broad discretion over assignment of prisoners.

Transcript of Proceedings Before the Honorable John A. Nordberg, May 9, 1996, at p. 37. The court stated that in so holding, it was joining the Fifth and Tenth Circuits as well as the Second. *See United States v. Mendoza–Lopez*, 7 F.3d 1483 (10th Cir.1993), *cert. denied*, 511 U.S. 1036, 114 S.Ct. 1552, 128 L.Ed.2d 201 (1994); *United States v. Nnanna*, 7 F.3d 420 (5th Cir.1993). From a review of the language the district court used in declining to depart, it appears, then, that the district court believed its ruling was required as a matter of law and that it was without discretion to depart downward on the basis of Farouil's status as a deportable alien. Therefore, we may review that refusal to depart.

■ This circuit has not yet addressed whether a defendant's status as a deportable alien is an appropriate matter for consideration when the district court is exercising its sentencing discretion, except in one limited circumstance. When a court sentences a defendant for the crime of being found in the United States after having been deported, we have held that status as a deportable alien may not be considered. *See United States v. Gonzalez–Portillo*, 121 F.3d 1122 (7th Cir. 1997); *United States v. Jackson*, 93 F.3d 335, 338–39 (7th Cir.1996) (declining to decide whether alienage may be considered a factor for the sake of a downward departure). At the time the district court sentenced Farouil, the Fifth and Tenth Circuits had adopted *Restrepo*, in *Nnanna* and *Mendoza–Lopez*, respectively.[6] Since that time, the Eleventh Circuit has weighed in as well, also adopting *Restrepo*. *See United States v. Veloza*, 83 F.3d 380 (11th Cir.1996). The Second Circuit in *Restrepo* determined that certain conditions that were the result of the defendant's status as a deportable alien were not appropriate considerations for downward de-

---

**6.** The Fifth Circuit, in *Nnanna*, adopted *Restrepo* without discussion, holding that "[c]ollateral consequences, such as the likelihood of deportation or ineligibility for more lenient conditions of imprisonment, that an alien may incur following a federal conviction are not a basis for downward departure." 7 F.3d at 422. In *Mendoza–Lopez*, the court sentenced the defendant for the crime of reentering the United States after having been deported. 7 F.3d at 1484. Although the court there purported to adopt *Restrepo* in declining to allow downward departures on the basis of status as a deportable alien, there is an additional basis in that circumstance to refuse to depart. When the crime for which a defendant is being sentenced is re-entering the United States after having been deported, we have held that the Guidelines already take into account the fact that the defendant is a deportable alien. *See Gonzalez–Portillo*, 121 F.3d 1122 (7th Cir.1997). In such a case, the defendant's status as a deportable alien can never take the case outside the heartland of Guidelines cases, and therefore that status is an inappropriate basis for departure. *Mendoza–Lopez* and *Gonzalez–Portillo* are inapplicable here because Farouil was being sentenced for importing heroin. The Guidelines provisions for this narcotics crime do not implicitly account for a defendant's status as a deportable alien.

parture. 999 F.2d at 645–47. In particular, the court found that the unavailability of preferred conditions of confinement, the possibility of an additional period of detention pending deportation following completion of the sentence, the effect of deportation as banishment from the United States and separation from family were inadequate considerations on which to base a downward departure. *Restrepo* appears to be based, at least in part, on the Second Circuit's belief that allowing a court to depart downward on the basis of status as a deportable alien encroached upon the discretion of the Bureau of Prisons. But *Restrepo* specifically "decline[d] to rule that pertinent collateral consequences of a defendant's alienage could not serve as a valid basis for departure if those consequences were extraordinary in nature or degree." 999 F.2d at 644. *See also United States v. Adubofour,* 999 F.2d 639 (2d Cir.1993) (applying *Restrepo* to a defendant with "less compelling personal circumstances" than defendant Restrepo). Presumably, the court left open for consideration those collateral consequences that were not the result of an exercise of discretion by the Bureau of Prisons. One circuit has ruled the other way. In *United States v. Smith,* 27 F.3d 649, 655 (D.C.Cir.1994), the court held that "a downward departure may be appropriate where the defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." It is this case that the defendant urges us to adopt.

What all of these opinions have in common is that they all preceded *Koon v. United States,* — U.S. —, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). As we have previously observed, *Koon* "generally informs us that the district courts enjoy broad discretion in deciding whether to depart when the particular facts of the case are outside the 'heartland' of Guidelines cases." *See United States v. Purchess,* 107 F.3d 1261, 1271 (7th Cir. 1997).

Before a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guidelines cases.

*Koon,* at — — —, 116 S.Ct. at 2046–47. *Koon* therefore allows the court to take into consideration any "unusual or exceptional" factor present in the case that has not already been taken into consideration by the Guidelines. As we noted, when the offense for which the defendant is being sentenced encompasses being present in the United States after having been deported, we ruled that the Guidelines already took into consideration the defendant's status as a deportable alien. But here, Farouil was charged with importing heroin into the United States, and we have no reason to believe that the Guidelines have accounted for a defendant's status as a deportable alien in setting the level for that offense. The district court is thus free to consider whether Farouil's status as a deportable alien has resulted in unusual or exceptional hardship in his conditions of confinement. Because the district court appears to have been under the impression that it lacked discretion to depart on the basis of status as a deportable alien, we reverse and remand for resentencing so that the court may again consider the defendant's motion for a downward departure in light of *Koon.*

### E.

■■■ We must address one final sentencing issue, the subject of the government's cross-appeal. The district court granted Farouil a three-level reduction, finding that his participation in the crime fell somewhere between minimal and minor. *See* U.S.S.G. § 3B1.2. We review the district court's section 3B1.2 determination under the clearly erroneous standard. *United States v. Soto,* 48 F.3d 1415, 1420 (7th Cir.1995). "The controlling standard for an offense level reduction under this section is whether the defendant was substantially less culpable

than the conspiracy's other participants." *United States v. DePriest*, 6 F.3d 1201, 1214 (7th Cir.1993). The defendant bears the burden of proving by a preponderance of the evidence that he was less culpable than the scheme's other participants. *Soto*, 48 F.3d at 1423. The government contends that nothing in the record permits an assignment of relative culpability among the participants in the scheme to import heroin and that the district court therefore clearly erred in granting the reduction.

The record reflects that there were three possible participants in the scheme to import heroin into the United States: Farouil, Alexis and Mounirou. Alexis was arrested, and ultimately convicted in Belgium for her role in the scheme.[7] The record reflects that she was carrying 4.5 kilograms of heroin in her luggage at the time of her arrest. Mounirou was arrested along with Farouil in the United States, but no drugs were found in his luggage and he was eventually released without being charged. The district court reasoned that the person carrying the most heroin was most likely the "mule," that is, that he was most likely the lowest ranking member of the team because he was expected to take the most risk by carrying the largest amount of drugs. Using this theory, the court reasoned that Mounirou, who was released and was carrying no drugs, was the leader of the group. The district court also reasoned that because it was attributing Alexis' drugs to Farouil, it should take into account that Farouil played a lesser role in relation to the total amount of heroin being attributed to him.

> So this court, now, in exercising its discretion, finds that Farouil qualifies as an intermediate participant, that is, that he falls between minimal and minor, or warranting a three-level decrease in the offense level. And this is based on the inferences the court draws from the evidence that was presented in this case.

Transcript of Proceedings before the Honorable John A. Nordberg, May 9, 1996, at p. 33.

At oral argument, Farouil's counsel was unable to tell us what evidence in the record supported the district court's finding that Farouil was less culpable than any other participant in the heroin importation scheme. We have combed the record for evidence that would support a conclusion that Farouil was less culpable than Mounirou or Alexis. In fact, we found no evidence that would have allowed the court to assign relative levels of responsibility to the alleged participants in this scheme. Without an evidentiary foundation to support the finding that Farouil was less culpable, the district court clearly erred by reducing his sentence three levels pursuant to section 3B1.2. Accordingly, we remand for resentencing consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

TERENCE T. EVANS, Circuit Judge, concurring in part and dissenting in part.

In all respects, except a tiny one, I join Judge Rovner's very persuasive opinion. My disagreement is with the decision to set aside the 3–level reduction Judge Nordberg granted for Farouil's role in the offense.

In *United States v. Burnett*, 66 F.3d 137, 141 (7th Cir.1995), we noted that § 3B1.2 "does not define 'minor participant' but does emphasize the judge's discretion." Here, Judge Nordberg thought the situation suggested that Farouil (who took on the most risk) was probably a mule and that he should be placed somewhere between a minor and minimal (talk about splitting split hairs!) participant under the sentencing guidelines. That's not, in my opinion, a bizarre view of the evidence. I'd honor Judge Nordberg's call, just as I would if, on the basis of this record, he had gone the other way. As we observed in *Burnett*, "This is what it means to say that a judge has discretion." *Id.* at 141.

---

7. Alexis received a three year sentence, and was released after serving one year.