**UNITED STATES of America,**

v.

**Derek TURNER, Defendant.**

**No. 05–CR–601 (DRH).**

United States District Court,
E.D. New York.

May 4, 2009.

---

Benton J. Campbell, United States Attorney, by Nicole Boeckman, A.U.S.A., Diane Beckmann, A.U.S.A., Central Islip, NY, for the Government.

James C. Neville, Esq., Port Washington, NY, for Defendant.

## ORDER AND MEMORANDUM

HURLEY, Senior District Judge.

### QUESTION PRESENTED

The question before the Court concerns under what circumstances may the defrauding of foreign victims by a foreign defendant, operating overseas, be considered relevant conduct under U.S.S.G. § 1B1.3(a)(2) for guideline calculation purposes following that defendant's conviction for wire fraud involving United States citizens as part of the same continuing course of conduct.

### BACKGROUND

On August 9, 2005, Derek Turner ("defendant" or "Turner") pled guilty, pursuant to a plea agreement, before District Judge Joanna Seybert of this Court to Counts One, Two, and Three of a three count information. Each of those counts charged the defendant with committing wire fraud between February 2001 and April 16, 2005 by sending false financial account statements by facsimile to a John Doe in violation of 18 U.S.C. § 1343.

The defendant was sentenced on February 16, 2006 by Judge Seybert to a sentence which included a period of incarceration of 240 months on each of the counts of conviction, to run concurrently. The case was then appealed to the Second Circuit which, by summary order dated December 17, 2007, remanded the case to the district court for *de novo* resentencing following the government's acknowledgment that "it violated the plea agreement at least three times when it sought more severe punishment than that anticipated by the plea agreement." *United States v. Turner,* 258 Fed.Appx. 360, 360 (2d Cir.2007). The remand was coupled with a direction, consistent with the Circuit's standard practice in such matters, that the case be randomly

assigned to another district court judge "because the effect of the government's breach of the plea agreement is too difficult to erase if the case stays before the same judge."[1] *Id.* at 361 n. 2. As a result of that process, the case is now before me with the government's prior offending communications having been culled from the sentencing materials.

There are a number of resentencing issues to be addressed. However, counsel have requested that I begin the process by determining whether defendant's foreign conduct constitutes relevant conduct under U.S.S.G. § 1B1.3. If it does, the probation department's calculation of the applicable advisory guidelines range exceeds the statutory maximum for the counts of conviction, to wit 20 years. Defendant maintains that his foreign activities involving purported foreign victims[2]—committed while he was a citizen of New Zealand, located in the Bahamas and with no "U.S. Status" (Sept. 13, 2005 Presentence Report ("PSR") at 2)—should be deleted from the analysis, thus producing, in his view, an advisory guideline range of 41 to 51 months.

By way of background, the government maintains that defendant created bogus hedge funds in Australia in 1999—viz. "Turning Investments Pty Ltd" and "Turning Holdings Pty Limited"—and directed investors, principally Australians and New Zealanders, to send their money to bank accounts at the Commonwealth Bank of Australia controlled by Turner. In order to entice investors, Turner claimed that he utilized a sophisticated trading technique, the so called "Gann Method," which purportedly minimized risk and enhanced returns. He also grossly exaggerated the amount of funds under his control, as well as the rate of return realized on those funds. Those that invested were initially furnished with investment certificates signed by defendant as "Director" and thereafter received periodic account statements containing material misrepresentations.

After encountering difficulties with the Australian Securities and Investments Commission ("ASIC") in May of 2000, Turner relocated his operation to the Bahamas—utilizing the name "Turning International Limited"—along with the funds on deposit in the Australian bank. From there, he began to solicit individuals from throughout the world, including the United States using essentially the same *modus operandi* employed in Australia.

Defendant's victimization of individuals in the United States provided the predicate for the three count information to which he pled guilty. His allocution at the time of the plea was as follows:

> In or about and between February 2001 through and including April 15, 2005, I was the owner of Turner International Limited, which was located in Nassau, the Bahamas.
>
> Turner International, also known as The Fund, was a hedge fund which invested in securities traded in the United

---

1. In directing reassignment upon remand to another district judge, the Circuit ascribed fault solely to the government absent "even the slightest criticism of the [initial] district judge." *Turner*, 258 Fed.Appx. at 361 n. 2.

2. Defendant reports, and the government does not contend otherwise, that "Derek Turner has not been charged with any crimes by authorities in the Bahamas, Australia, or New Zealand." (Def.'s Sept. 5, 2008 Letter Br. at 3 n. 1.) Parenthetically, for foreign conduct to be relevant for § 1B1.3 purposes it must be criminal. *See, e.g., United States v. Dove,* 247 F.3d 152, 159–60 (4th Cir.2001) and *United States v. Schaefer,* 291 F.3d 932, 939–40 (7th Cir.2002); *cf. United States v. Silkowski,* 32 F.3d 682, 687 (2d Cir.1994).

States markets such as the New York Stock Exchange.

Between the dates listed above, I promoted the fund through the telephone and by fax, simply informing investors that the fund generated annual profits of 37 percent and that fund had in excess of 300 million in the Scotia Bank of the Bahamas. Those statements were false and untrue.

In addition, I provided monthly account statements to various investors which fraudulently represented active account balances and monthly returns on the investments.

On or about February 1, 2005, and March 1, 2005, I wired faxed [sic] potential investors untrue fraudulent statements here in the Eastern District of New York. In fact I used those monies received from investors to purchase commercial properties in the Bahamas, which will be sold to make all clients whole.[3]

(Aug. 9, 2005 Tr. of Proceedings before the Hon. Joanna Seybert, U.S.D.J. at 16–17.)

The government reports that its investigation indicates "that Turner's company never generated a profit from its investments in equities and that the balance in the fund's bank exceeded $1.5 million. Instead of investing his clients' funds in the United States equities markets, Turner purchased commercial properties for his own benefit. The fraud ultimately was determined to have resulted in $55,094,220 in losses to 60 victims." (Gov't's Aug. 8, 2008 Letter Br. at 3 (internal citations to PSR deleted).)

Before discussing the positions of the parties, brief mention will be made of § 1B1.3 independent of the complicating "foreign conduct" factor. That will be followed by an overview of the Second Circuit's seminal decision regarding § 1B1.3 and foreign conduct, viz. *United States v. Azeem*, 946 F.2d 13 (2d Cir.1991). Such an overview is necessary to place the parties' positions in context, and will serve as a prelude to a fuller discussion of the topic later in this opinion.

## DISCUSSION

1. *Relevant Conduct Under § 1B1.3*

(a) *Guideline Text*

Section 1B1.3, entitled "Relevant Conduct (Factors that Determine the Guideline Range)" reads in pertinent part:

a) *Chapters Two (Offense Conduct) and Three (Adjustments)*. Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

(1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detec-

---

**3.** Defendant's company is recorded as "Turner International Limited" on two occasions in his allocution. Presumably, it should be "Turning International Limited."

tion or responsibility for that offense [hereinafter referred to as the "Trailing Clause" of subdivision (1)(A) and (1)(B) of § 1B1.3 (a) ];

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction; ....

(b) *Interpretation of § 1B1.3(a)(2) Minus the Trailing Clause.*

Defendant stands convicted of three counts of wire fraud under 18 U.S.C. § 1343. Wire fraud is an offense which requires "grouping" under U.S.S.G. § 3D1.2(d). As a result, defendant is accountable for sentencing purposes not only for the conduct embodied within the offenses of conviction but also for his criminal conduct which was "part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Although a "common scheme or plan" and "same course of conduct" are closely related, they are not the same. *See id.* application note 9. "For two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.* application note 9(A). "Offenses that do not qualify as part of a common scheme or plan may nonetheless qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." *Id.* application note 9(B).

Here, a juxtapositioning of the government's proffer as to defendant's foreign and domestic activities with a literal reading of § 1B1.3(a)(2)—minus the Trailing Clause—indicates that, if proven, those activities fit comfortably within the ambit of the Guideline's definition of relevant conduct as both part of a common scheme and as part of the same course of conduct.

(c) *Interpretation of § 1B1.3(a)(2) as Including the Trailing Clause*

If the reference in § 1B1.3(a)(2) to "subdivision (1)(A) and (1)(B)" is read to mean that the conduct subject to grouping must have occurred "during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense," the legitimacy of, for instance including some of the earlier foreign victims into the sentencing loss calculations becomes problematic. U.S.S.G. § 1B1.3(a)(1) (the Trailing Clause).

The time frame for the offenses of conviction pertaining to John Does 1 through 3 are "in or about between February 2001 and April 16, 2005." (Information ¶ 4.) Therefore, to the extent the Trailing Clause is considered part of § 1B1.3(a)(2), the government will presumably be hard-pressed to convincingly argue that losses sustained by victims prior to February of 2001 are relevant for sentencing purposes.

Although very few of the reported cases in our and other Circuits include reference to the subject § 1B1.3(a)(1) language in their discussions of § 1B1.3(a)(2), some do including the Second Circuit in *United States v. Fitzgerald,* 232 F.3d 315, 320 (2d Cir.2000) ("Because the tax evasion, fraud, and conversion offenses are properly grouped under § 3D1.2(d), Fitzgerald's fraud and conversion constitute relevant conduct under § 1B1.3(a)(2) so long as the fraud and conversion are found to be an

act or omission 'described in subdivision (1)(A) . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction.' "; the portion of "subdivision (1)(A)" cited in *Fitzgerald* is found in its footnote 7 which reads "[s]ubdivision (1)(A) requires that an act or omission occur 'during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detention or responsibility for that offense' ") (internal quotation marks and citations deleted). *Contra United States v. Johnson*, 347 F.3d 635, 638–40 (7th Cir.2003); *United States v. Vigil*, 476 F.Supp.2d 1231, 1284–85 (D.N.M.2007) ("The paragraph structure of subsection (a)(1)–with its indentations–makes clear that U.S.S.G. § 1B1.3(a)(2) incorporates only subdivisions (1)(A) and (1)(B), not all of subsection (a)(1) [i.e. not the Trailing Clause]; otherwise, relevant conduct beyond the crime of conviction would fall outside the scope of U.S.S.G. § 1B1.3(a)(2) and the entire subsection would be rendered meaningless.").

Given that this issue has not been previously mentioned by the Court or either party, and that I have accepted, subject to a number of preconditions discussed *infra*, that one of the government's theories is adequate to include some or all of the foreign victims in the sentencing calculations, input from counsel is required on this issue, viz. whether the last three lines of § 1B1.3(a)(1) should be read into § 1B1.3(a)(2).[4]

In any event, to the extent some or all of Turner's foreign conduct falls within § 1B1.3(a)(2) as part of the same scheme or course of conduct as the counts of conviction, that does not necessarily mean, as discussed *infra*, that his defrauding of for-

eign investors may be factored into his total offense level as relevant conduct.

2.  *United States v. Azeem, 946 F.2d 13 (2d Cir.1991)*

The defendant in *Azeem* was convicted of conspiracy to import heroin into the United States. The realized goal of the conspiracy was to transport heroin from Pakistan to New York. At about the same time, Azeem, and one of his conspirators vis-a-vis the Pakistan to New York transaction, arranged for the delivery of additional heroin from Pakistan to Cairo. The question arose whether that second transaction should be included as relevant conduct in determining Azeem's guideline range. Azeem argued to the Circuit that it should not be, "because 1) it was not part of the same crime and 2) it was not a crime against the United States." *Azeem*, 946 F.2d at 15.

The Circuit gave short shrift to the first argument, finding that the Cairo transaction was properly included in the guideline calculations because it was part of the same "course of conduct" as the count of conviction. *Id.* at 16 (citing § 1B1.3(a)(2)). Azeem fared better on his second argument, with the Circuit agreeing "that the Cairo transaction should not have been included in the base offense level calculation because it was not a crime against the United States." *Id.* In reaching that conclusion, the Circuit explained:

The Guidelines section on base offense levels is broadly worded to include "all such acts and omissions that were part of the same course of conduct or common scheme or plan," but does not explicitly address the issue of foreign crimes and activities. However, the

4.  In the CONCLUSION of this opinion, the Court will list the previously unaddressed significant items bearing on the foreign conduct issue, and provide the procedure for counsel to submit their views.

Guidelines elsewhere note that foreign *sentences* may not be used in computing a defendant's criminal history category, but may be used for upward departures from the otherwise applicable range.[5]

From these provisions, it follows that Congress, while it has not remained entirely silent, has chosen to assign to foreign crimes a rather limited role. We decline to find that Congress intended to require that foreign crimes be considered when calculating base offense levels simply because Congress did assign foreign crimes a role in fixing upward departures, while remaining silent on their role in calculating base offense levels. Not every congressional silence is pregnant. In general, congressional consideration of an issue in one context, but not another, in the same or similar statutes implies that Congress intends to include that issue only where it has so indicated. In this case, Congress has already shown that where it intends to include foreign crimes in sentencing [as it did for upward departures,] it will do so.

*Id.* at 17 (internal citations and parentheticals deleted).

Although the holding in *Azeem* is primarily, if not solely rooted in the Circuit's interpretation of the intent underlying the promulgation of § 1B1.3(a)(2), the Court, nevertheless, underscored that "there are good reasons" for excluding foreign crimes from base offense level calculations. *Id.*

To do [otherwise] would require distinguishing between activities that violate both domestic and foreign law and those which violate only domestic law or only foreign law. Examples of activities that violate one, but not both, foreign and domestic laws could be the use and sale of certain drugs that would have violated our law, but not the foreign law where sold and used, or a certain use of alcohol that violates the foreign law where used but would not have done so under domestic law. To permit foreign crimes to figure in fixing the base offense level would require courts to perform a careful comparative analysis of foreign and domestic law in such instances. At some point the advantages of simplicity should prevail. This is one of them.

*Id.*

### 3. *Probation Department's Guideline Calculations, Initially and Now*

The government maintains that the Probation Department's February 1, 2006 amended PSR correctly recommends a total offense level of 39, resulting in a sentencing range of 262 to 327 months.[6] The corresponding figures in the initial PSR dated September 25, 2005 were a level 30 and a guideline range of 97 to 121 months.[7] The 9 level differential in the base offense level between the original and the amended PSRs is attributable to (1) an escalation in the loss amount from $15,686,462 (sustained by 57 victims) to $63,836,408 (sustained by 63 victims),[8] (2) the elimination

---

5. The cites provided regarding the "upward departures" referenced in the above quote from *Azeem* are §§ 4A1.2(h) and 3A1.3(a), both of which pertain to considering foreign sentences in evaluating the sufficiency of a defendant's criminal history category.

6. As noted earlier, the statutory maximum for each of the counts of conviction is 20 years.

7. The parties' Plea Agreement estimated the total offense to be a 29 and the guideline range to be 87 to 108 months.

8. The loss amount reported in the September 16, 2008 Second Addendum to the PSR is $55,094,220, rather than the $63,836,408 amount indicated in the February 1, 2006 PSR. The $8,000,000 plus difference, however, does not effect the guideline calculations. *See* U.S.S.G. § 2B1.1(b)(1)(M).

of the previously given 3 level reduction for acceptance of responsibility, and (3) an added two level obstruction of justice enhancement.[9]

The increased loss amount is primarily the result of adding the losses said to have been sustained by Australian John Knight in Australia to the tune "of $51,199,697 Australian dollars (the U.S. equivalent of $37,770,016)". (Second Addendum to PSR (Revised) dated Sept. 16, 2008 at 1.) [10]

### 4. *Government's Position*

*Azeem,* as the government correctly notes, bifurcates the § 1B1.3 analysis into two parts: (1) whether the subject conduct is part of the same course of conduct or common scheme as the offense of conviction and (2) whether the conduct is a crime against the United States. As to the same course of conduct or common scheme portion of the analysis, it was the government's understanding that the defendant had conceded that issue when the case was before Judge Seybert and, accordingly, the primary focus of its current arguments concerns *Azeem's* second requirement, i.e. whether the conduct involved constituted a crime against the United States.

The gravamen of the government's position in its numerous written submissions is that Turner's conduct, both domestic and foreign, entails one continuous, inextricably intertwined, i.e. non-severable scheme and, thus, is not subject to the *Azeem* rationale and requires that all of the associated conduct be considered for purposes

of § 1B1.3. That is so, the government posits, even though some of the subject acts "would not be crimes against the United States [referencing Defendant's foreign conduct] if they were unconnected to an American scheme." (Gov't's Aug. 8, 2008 Letter Br. at 10.) This argument will be referred to as the government's "inextricably intertwined theory."

During oral argument on November 19, 2008, however, the government seemed to take a different tack, arguing that Turner's transfer of money from Australia to the Bahamas through a United States correspondent bank "would give the United States jurisdiction to charge that fraud [under 18 U.S.C. § 1343]," even "absent any evidence [of] commingling" (hereinafter "transfer jurisdictional theory"). (Nov. 19, 2008 Tr. at 12; *see also id.* at 14.) The Court was then advised that "[i]t will be the government's position that if the United States has jurisdiction over the offense it would be a crime on the United States [for purposes of satisfying the second prong of the *Azeem* standard]." (*Id.* at 14.) And if the transfer was sufficient by itself to confer jurisdiction, the transfer plus, inter alia, the later commingling and use by Turner of domestic and foreign victims' funds in perpetrating the subject Ponzi scheme, is, the government maintains, certainly more than sufficient for that purpose (hereinafter "transfer plus jurisdictional theory").

The positions urged at oral argument as to the government's "transfer jurisdiction-

---

**9.** Defendant posits that the differential is not 9 levels but rather 11. (Def.'s Sept. 5, 2008 Letter Br. at 11.)

**10.** The current PSR recommendation is based on the common *modus operandi* utilized by defendant in defrauding "investors in Australia ... [,] the United States, the Bahamas, England, Singapore, and other countries world wide," viewed in conjunction with the representation by the government "that funds

invested by Dr. Knight, as well as other overseas victims, were either deposited or cleared through U.S. bank accounts." (Second Addendum to PSR (Revised) dated Sept. 16, 2008 at 5.) Mention of *Azeem* is absent from the PSR analysis. Moreover, the record is devoid of evidence that Dr. Knight's funds, or those of any other foreign victims, were "deposited [in] U.S. bank accounts." (*Id.*)

al" and "transfer plus jurisdictional" theories are succinct and essentially consist of what has already been stated.[11] The same may not be said of its "inextricably intertwined theory," which is multi-faceted and includes the following:

a. The monies on deposit in the Commonwealth Bank of Australia were routed "through correspondent banks in the United States" when Turner relocated his operation from Australia to the Bahamas. (Nov. 14, 2008 Tr. at 12–13);

b. Some foreign victims sent additional sums to Turner's operation in the Bahamas via "Telegraphic Transfer[s]" through United States correspondent banks. (*See, e.g.,* Ex. B attached to the Sept. 23, 2005 Petition of Ian Gordon Turner referenced in the Gov't's Aug. 8, 2008 Letter Br. at 11);

c. Upon Turner's expansion of his operation to include United States investors, their monies were commingled in the Scotiabank account in the Bahamas with funds obtained from foreign investors. (Nov. 19, 2008 Tr. at 6);

d. From that Scotiabank account, the government proffers, "commissions [were paid] to salespeople in the United States perpetrating the United States fraud." (*Id.* at 7);

e. In Turner's "trading room in the Bahamas," there were "plasma screens . . . leased from Bloomberg in the United States," with "live feed," all paid for with the commingled investor funds in the Scotiabank account. (*Id.*);

f. Turner established a trading account in November 2000 at R.J. O'Brien in Chicago funded with $1,250,000 taken from two additional accounts of Turning International in the Bahamas, to wit, one at "Barclays and [the other at] Citibank." (*Id.* at 8. *See also* Gov't's Nov. 12, 2008 Letter Br. at 3);

g. Turner had an investment brochure "manufactured . . . in the Eastern District of New York" which "brochure was paid for out of the Scotia Bank account." (Nov. 19, 2008 Tr. at 8); and

h. Given that this was a "Ponzi scheme," coupled with the fact that investors' monies were supposedly commingled in the Scotiabank account, the government proffers that foreign monies were used to make some payments to the United States investors and vice versa. (*Id.* at 9.)

During oral argument on November 19, 2008, the government indicated that although the services of a United States correspondent bank were required to be, and were used to transfer foreign victims' monies to the Bahamas,[12] it had no proof that a "US bank account . . . was used . . . to implement the fraud of foreign investors." (Nov. 19, 2008 Tr. at 5–6; *see also* Nov. 14, 2008 Tr. at 20–21.) And to the court's inquiry whether the R.J. O'Brien account was involved in the purported fraud, the government indicated, as earlier noted, that monies were taken from the Barclays and Citibank facilities in the Bahamas to fund that account, and that of the $1,250,000 involved all but $75,000 was

---

11. The "transfer jurisdictional theory" and "transfer plus jurisdictional theory" shall be referred to collectively as the government's "jurisdictional theories."

12. As explained by the government during oral argument on November 14, 2008, in discussing "the importance of . . . corespondent banks, it would basically be impossible for . . .

the CBA account in Australia . . . to transfer [funds] directly to the Bahamas absent United States intervention. There would be no way for Australia to directly wire that. The U.S. bank, the correspondent bank, is a necessary piece of the puzzle for him to get his money from point A to point B." (Nov. 14, 2008 Tr. at 34.)

lost, with that remainder being remitted to the Scotiabank. Whether any of the monies invested by Knight were ever included in the R.J. O'Brien account because of commingling of investor funds is not entirely clear based on the materials furnished. What is clear, however, is that the R.J. O'Brien account was not used to defraud investors or to otherwise advance the scheme.

### 5. Defendant's Position

The defendant's arguments, in positing a loss figure of "$3.98 million U.S. Dollars" for purposes of calculating defendant's guideline range (Def.'s July 7, 2008 Letter Br. at 3), are as follows:

a. "Derek Turner has not been charged with any crimes by the authorities in the Bahamas, Australia, or New Zealand. Thus, Mr. Turner's situation is *exactly* the type of case envisioned by the Second Circuit in its analysis in *Azeem*. The United States Courts would be compelled to analyze the alleged crimes committed in these various foreign jurisdictions and determine whether they were constitutionally proper by United States standards, and, after potentially passing such scrutiny, what punishment would be appropriate for said alleged crimes. In any event, all parties herein are completely ignorant as to what, if any crimes Mr. Turner may have committed in those foreign jurisdictions outlined above. Mr. Turner must be punished for that which can be considered a crime against the United States. In this case, that would be only the $3.98 million U.S. Dollars that came to Turning International in

the Bahamas by way of United States bank accounts, controlled by United States citizens or legal residents." (Def.'s Sept. 5, 2008 Letter Br. at 3, n. 1);[13]

b. "Mr. Conway, over the vehement objections of Mr. Turner, agreed to a loss amount of $16,706,765.00 for the purposes of a Guideline Range." (Def.'s Nov. 12, 2008 Letter Br. at 3);[14]

c. "The government contends that *Azeem* is distinguishable from Turner's case because the acts underlying Turner's overall scheme were more inextricably intertwined. However, the government's position both misconstrues the facts in *Azeem* and continues its error in looking at the offense of wire fraud as the actor's underlying intent [i.e. the *mens rea* element of wire fraud] as opposed to his act [i.e. the use of the wires] manifesting or accomplishing that intent. Each wire communication is no less a separate crime than each act of distributing drugs as part of a broader distribution scheme [as was present in *Azeem*]." (Def.'s Sept. 5, 2008 Letter Br. at 9);

d. "Whereas Turner solicited his U.S. investors by means of a written prospectus that contained numerous false representations about the size of Turner's portfolio, his current trading activity, and his extraordinary annual gains, Knight merely alleged that Turner, in conversation, unduly minimized the risks and unduly touted the benefits of his investments strategies .... The only clearly fraudulent conduct involving Knight occurred several years later

---

**13.** For a more detailed explanation of defendant's claimed loss figure, *see* Def.'s Oct. 30, 2008 Letter Br. at 4.

**14.** Defense counsel sent two letters to the Court dated November 12, 2008 which were

filed in the Clerk's Office on November 13, 2008, one with an attachment, one without. The above cite is to the November 12th letter with an attachment.

when Mr. Turner, now operating in the Bahamas, sent Dr. Knight account statements falsely reporting investment income. Such misconduct did not retroactively convert Mr. Turner's acceptance of Dr. Knight's original investments into fraud. In sum, the individual criminal acts in *Azeem* were far more 'intertwined' than the acts over six years compromising Mr. Turner's alleged scheme." (*Id.* at 10);

e. "[I]t would be error to incorporate the losses suffered by Dr. Knight and as many as 14 other overseas investors with no nexus to the United States, and in classifying them as 'victims.' This would unfairly cause Mr. Turner's Guidelines level to be increased by eleven levels . . . ." (*Id.* at 11);

f. Defendant contends that, contrary to the position urged by the government, "Mr. Turner *did not commingle* Dr. Knight's funds from Australia with monies of citizens of the United States." (Def.'s Oct. 30, 2008 Letter Br. at 3);

g. Defendant points out that to the extent monies were transferred from an Australian bank to one or more banks in the Bahamas through correspondent banks in New York, such movement represents a de minimis contact with this jurisdiction since it was done via "an electronic pulse or instantaneous switching process, resulting in such funds being electronically directed to the Bahamas. The correspond[ent] bank in New York is not a bank where Turning International, Ltd. had any account at any time. Turning International never had any bank accounts in the United States of America." (*Id.* at 4); and

h. "The Government cannot prove, definitively, what, if any, of Dr. Knight's

funds were sent to the R.J. O'Brien account of Mr. Turner. The Government, in order to justify a life sentence for Mr. Turner has to do better than simply to write that 'Dr. Knight's funds *appear* to have been sent to the R.J. O'Brien account.'" (Def.'s Nov. 12, 2008 Letter Br. at 4 [15] (quoting Gov't's Nov. 12, 2008 Letter Br. at 3).)

Before proceeding to the DISCUSSION portion of this opinion, it warrants mention that defense counsel, not only in his written submissions but during oral argument as well, has consistently challenged the government's position that Turner's transfer of monies from Australia to the Bahamas via a New York correspondent bank would have provided a predicate to include his overseas conduct in a domestic prosecution, thus supposedly satisfying Azeem's "crime against the United States" standard. In defense counsel's view, that de minimis contact is insufficient to override the holding and rationale in *Azeem*.

6. *Section 1B1.3(a)(2) Rule in the Second Circuit Regarding Foreign Conduct as Explained in United States v. Azeem and United States v. Chunza–Plazas*

As noted, *Azeem* is the seminal Second Circuit case in which it was held that a defendant's foreign conduct should not be considered in the calculation of his base offense level given that such conduct was not a crime against the United States. Another, as yet unmentioned Second Circuit decision which is instructive for present purposes is *United States v. Chunza–Plazas,* 45 F.3d 51 (2d Cir.1995).

Chunza was convicted of possessing false immigration documents. The government sought, inter alia, "an upward

---

**15.** This cite is to defense counsel's other November 12, 2008 letter, i.e. the one without an attachment.

departure [of 16 levels in computing his offense level, pursuant to §§ 5K2.0 and 5K2.9], claiming that Chunza's motivation in obtaining and using the false green cards [was] .... to assist Escobar in collecting money owed to the [Medellin c]artel and to avoid further prosecution in Columbia related to his activities in the [c]artel." *Id.* at 52, 54 (internal citations and quotation marks omitted).

The district court granted the government's application, explaining

> it seems to me that certainly by a preponderance of the evidence Mr. Chunza was a member of the Medellin Cartel. He committed criminal acts at the behest of Mr. Pablo Escobar and came to the United States both to assist Escobar in collecting money—and I think it's a fair inference that he also came to the United States to avoid further prosecution....

*Id.* at 55.

That determination was vacated by the Circuit:

> The same considerations considered in *Azeem* with respect to [the] base offense level, should guide our determination of whether Chunza's conduct in Colombia may be considered for an upward departure. Like Azeem's Egyptian conspiracy, Chunza's illegal activities in Columbia were not crimes against the United States, and therefore should not be included in the guideline calculation.

*Id.* at 57.

In sum, *Chunza–Plazas*, like *Azeem*, instructs that foreign conduct not constituting crimes against the United States should not be considered for purposes of calculating the guideline range for the counts of conviction.

### 7. Several Other Guideline Cases Which Mention Azeem and Chunza–Plazas Warrant Discussion

#### (a) Southern District of New York Decision in United States v. Teyer

To the extent that *Azeem* and *Chunza–Plazas* may be proffered as support "for the proposition 'that criminal conduct committed by a foreigner in a foreign country can not be considered as relevant conduct or be used as the basis of an upward departure'" (quoting from defendant's Br.), Judge Lynch of the Southern District has opined that "[n]either case can be so broadly construed." *United States v. Teyer*, 322 F.Supp.2d 359, 367 n. 3 (S.D.N.Y. 2004).

*Teyer* did not involve § 1B1.3 but rather the issue of whether an obstruction of justice enhancement should be made under § 3C1.1 in calculating defendant's guideline range. Torres–Teyer was arrested and charged in Belize with possession of 1500 kilograms of cocaine which were destined for the United States. He arranged to bribe his co-defendants to take full responsibility for the drugs, as well as a Belizean magistrate to ensure his acquittal in that jurisdiction. Judge Lynch applied the subject enhancement, reasoning that the Belizean prosecution and the investigation of Torres–Teyer by the DEA and other United States authorities were so "closely intertwined," that Torres–Teyer's "effort to frustrate the Belizean prosecution would reasonably be expected to have an effect on the prosecution here." *Id.* at 367. And, given that § 3C1.1 explicitly requires that a defendant's conduct be "willful," also implicitly embraced in the *Teyer* holding is the requirement that such an obstructive effect must have been intended by Torres–Teyer.

*Teyer* holds (1) that if a defendant engages in foreign conduct which is closely intertwined with the count or counts of

conviction, and was intended to impede a United States investigation and/or prosecution, he or she is appropriately saddled with a 2 level § 3C1.1 enhancement, and (2) nothing in *Azeem* or *Chunza–Plazas* dictates a contrary result.

Before discussing some decisions mentioning *Azeem* from other Circuits, one of the Second Circuit cases mentioned in *Teyer*, *United States v. Greer*, 285 F.3d 158 (2d Cir.2002) will be discussed.

### (b) Second Circuit in *United States v. Greer*

The relevant portion of *Greer* involves the government's cross-appeal directed at the district court's exclusion for sentencing purposes of a quantity of drugs that were attributable to the defendant but were not intended for distribution in the United States and had already been the subject of a Canadian prosecution. Greer was convicted in the United States of, inter alia, conspiring to import hashish and marijuana in violation of the Maritime Drug Law Enforcement Act ("MDLEA").[16] The proof established that from 1989 to 1991, Greer and his co-defendants offloaded tons of contraband from vessels in the St. Lawrence River into the United States and into Canada for distribution in those countries. At sentencing, the district court held that only the portion of product earmarked for distribution here, i.e. 2% of the total, constituted relevant conduct under § 1B1.3(a)(1)(A), concluding that the other 98% constituted " 'foreign drugs.' " 285

F.3d at 179. The Circuit reversed, pointing out that *Azeem* was not inconsistent with its determination since in *Azeem* the crimes were not committed against the United States, whereas the crimes committed by Greer were "not foreign crimes; the MDLEA is a United States criminal statute that specifically covers conduct outside the United States." *Id.* at 179–80.

### (c) Seventh Circuit Court of Appeals' Decisions Citing, but Distinguishing *Azeem* and *Chunza–Plazas*

Another case cited in *Teyer* is *United States v. Dawn*, 129 F.3d 878 (7th Cir. 1997), a Seventh Circuit decision distinguishing both *Azeem* and *Chunza–Plazas* upon which Dawn apparently placed considerable stock.

Dawn pled guilty to receiving and possessing films depicting minors engaged in sexually explicit conduct. He admitted that he produced the films in Honduras while employed there as a schoolteacher. At sentencing, the district court cross-referenced the guideline for the production of child pornography, thus substantially increasing the guideline range.

*Dawn's* reliance on *Azeem* and *Chunza–Plazas* in arguing that the enhancement was improperly imposed was unavailing, with the Seventh Circuit panel explaining:

> In *Azeem,* the conduct in question (distribution of heroin abroad) took place wholly on foreign soil and had no link to

16. At the time of the *Greer* decision, "[t]he MDLEA ma[d]e[ ] it unlawful for 'any person on board a vessel of the United States, or on board a vessel subject to the jurisdiction of the United States ... to knowingly or intentionally ... distribute ... a controlled substance.' " *Greer*, 285 F.3d at 174 (quoting 46 U.S.C. app. § 1903(a), presently codified at 46 U.S.C. § 70503(a)). The Act provided that "a 'vessel subject to the jurisdiction of the United States' includes ... a vessel located in the territorial waters of another nation, where the nation consents to the enforcement of United States law by the United States." *Id.* (quoting 46 U.S.C. app. § 1903(c)(1)(E), presently codified at 46 U.S.C. § 70502(c)(1)(E)). "Consent ... may be proved by the certification of the Secretary of State or the Secretary's designee." *Id.* (quoting 46 U.S.C. app. § 1903(c)(1)(E), presently codified at 46 U.S.C. § 70502(c)(2)(B)).

the offense of conviction (conspiring to import heroin into the United States) other than being part of the same course of narcotics trafficking. In *Chunza–Plazas,* the link was more tenuous; the defendant had committed murder abroad and subsequently fled to the United States, where he was eventually convicted of possessing false immigration documents. In this case, however, Dawn's exploitation of minors in Honduras created the very pornography that he received and possessed here in the United States. In a literal sense, then, Dawn's domestic offenses were the direct result of his relevant conduct abroad; pragmatically speaking, they are inextricable from one another.

*Id.* at 885 (citations deleted).

The *Dawn* reference to the foreign production of the child pornography being "inextricabl[y]" linked to the possession count of conviction is at least arguably akin to that portion of the *Teyer* holding which speaks of the foreign conduct being "closely intertwined" with the United States crimes committed by Torres–Teyer.

Another opinion of the Seventh Circuit discussing *Azeem* and *Chunza–Plazas* is *United States v. Farouil,* 124 F.3d 838 (7th Cir.1997). Farouil was found guilty by a jury of knowingly importing heroin into the United States. At sentencing, he was held accountable, under § 1B1.3(a)(2), for drugs recovered from his traveling companion upon her arrest in Belgium which drugs were intended for transport to the United States as part of the same scheme of which defendant stood convicted.

That determination was affirmed, with the Circuit finding that Farouil's reliance on *Azeem* and *Chunza–Plazas* was mis-

placed because his traveling partner's "crime was ... directed against the United States, unlike *Azeem* and *Chunza–Plazas* where the foreign crimes did not affect the United States and were not intended to affect the United States." *Id.* at 845.

8. *Application of Azeem, Chunza–Plazas, Greer, Teyer, Dawn, and Farouil to Government's Request That Turner's Foreign Conduct be Considered in Determining his Guideline Range Under its Inextricably Intertwined Theory.*[17]

■ To partially reiterate, under *Azeem* foreign conduct may not be considered in calculating a defendant's guideline range unless such conduct (a) is part of the same scheme or course of conduct as the count or counts of conviction under § 1B1.3(a)(2), and (b) constitutes a crime against the United States. *Chunza–Plazas* indicates that the same rationale precludes an upward adjustment of the guideline offense level based on a defendant's foreign conduct.

However, the *Azeem* rationale is not applicable to cases such as *Greer* where the purported foreign conduct is not foreign at all, being specifically covered, and thus violative of a United States criminal statute.

Finally, such cases as *Teyer, Dawn* and *Farouil,* though not binding on this Court, indicate that foreign relevant conduct closely intertwined and directed at this Country (as in *Teyer* and in *Farouil* ), or "inextricabl[y]" tied to the count of conviction (as in *Dawn* ) should be factored into the sentencing guideline calculations and that such inclusion does not run afoul of *Azeem* and *Chunza–Plazas.*

**17.** The government has not cited nor relied upon the impact rationale embodied in such cases as *Teyer* and *Farouil.* Nonetheless, a discussion of those cases has been included given that those decisions are among the few that discuss *Azeem,* and *Teyer* discusses the link between Torres–Teyer's foreign conduct and his domestic prosecution.

It is undisputed that Turner, a New Zealand citizen, while operating first in Australia and later from the Bahamas, engaged in the foreign conduct, viz. the purported defrauding of non-Americans, which the government contends constitutes relevant conduct and, as such, should be factored into Turner's sentence for defrauding John Does 1 through 3.

The thrust of the government's argument under its inextricably intertwined theory is not that Turner's foreign conduct violated a specific United States statute as in *Greer*, or was intended to produce an effect or impact in the United States as in *Farouil* and *Teyer*. Nor does the government maintain that Turner's conduct in defrauding residents of Australia, New Zealand and other non-Americans, viewed independently of his victimization of John Does 1, 2 and 3, satisfies *Azeem's* "crime against the United States" standard. (*See* Gov't's Aug. 8, 2008 Letter Br. at 10.) Instead, it argues that all aspects of Turner's scheme, as evidenced by the earlier identified facts, are "inextricably intertwined" to the extent that both the foreign and domestic conduct must be considered together in determining Turner's guideline range. (*Id.* at 13.)

The linchpin of the government's argument, i.e. the phrase "inextricably intertwined," is akin to the language "inextricable from one another" found in *Dawn*. As the reader will recall, Dawn was the schoolteacher from the United States who produced child pornography in Honduras and, upon returning to America, brought his work product with him, leading to his arrest and conviction for possession of child pornography; his guideline calculations were enhanced via a cross-reference to § 2G2.1, the guideline pertaining to the production of such material. The Seventh Circuit, while expressing misgivings about the analytical foundation for the *Azeem*

holding, *Dawn*, 129 F.3d at 885 n. 11, explained that "[i]n *Azeem*, the conduct in question (distribution of heroin abroad) took place wholly on foreign soil and had no link to the offense of conviction (conspiring to import heroin into the United States)," whereas "Dawn's domestic offenses were the direct result of his relevant conduct abroad" and thus the holdings in the two cases are not at odds. *Id.* at 885.

*Dawn*, of course, is not binding on this Court. Whether the Second Circuit would have reached the same conclusion as their fellow circuit judges in the Seventh Circuit on the same facts is problematic for it is difficult to reconcile its holding with *Azeem's*. Moreover, Turner's domestic conduct, while clearly part of the same scheme and course of conduct, cannot legitimately be labeled, in the language of *Dawn*, "as the direct result of his ... conduct abroad." Accordingly *Dawn* provides scant, if any, aid to the prosecution.

Of the cases brought to the Court's attention by the parties, as supplemented by in-chambers research, the district court decision in *Teyer* alone seems to lend some, albeit insufficient support for the government's position under its inextricably intertwined theory. On the plus side from the government's perspective, at least at first blush, is *Teyer's* reliance in making the obstruction of justice enhancement on the "close[ ] intertwin[ing]" between the foreign conduct in Belize and domestic count of conviction. *Teyer*, 322 F.Supp.2d at 367. But central to that interrelationship was the underlying pre-indictment joint binational investigation of the defendant, a circumstance not present here. Moreover, the joint investigation of Torres–Teyer must be viewed in conjunction with the other, and more significant factor embodied in the *Teyer* interrelationship analysis, that being that defendant's

conduct in Belize could "reasonably be expected" to have a negative impact on the prosecution in this country. *Id.* That other factor, viz. the foreign conduct targeting the United States, is also absent as to Turner's Australia and Bahamas-based victimization of foreign investors. Which is to say, *Teyer,* does not support the government's inextricably intertwined theory.

The government urges that its factual proffers—previously listed, and assumed for purposes of the argument currently under discussion to be true—compel the conclusion that "[u]nlike in *Azeem,* . . . it is impossible to separate Turner's conduct into a 'foreign component' and a 'United States component.'" (Gov't's Aug. 8, 2008 Letter Br. at 13.) This argument, made absent any supporting authority, is unconvincing. Just as the Circuit parsed the domestic and foreign components of the shared course of conduct in *Azeem,* the same may, and should be done here. There is no reason to believe that the losses sustained by the American investors for guideline purposes may not be calculated independently from those said to have been sustained by foreign investors as a result of Turner's foreign crimes.

In both *Azeem* and here it is clear that the defendant's ongoing domestic and foreign criminal activities were part of the same "course of conduct" for purposes of § 1B1.3(a)(2). Accordingly, it is not surprising that there were significant overlaps between the different parts of their respective operations. Nonetheless, the interrelationship here, as previously noted, falls far short of that present in *Dawn,* and there is no evidence to suggest, unlike in *Teyer,* that the subject foreign conduct (i.e. the defrauding of Knight and other foreign investors) targeted, or was intended to produce some type of impact in the United States. *Cf. United States v. Goldberg,* 830 F.2d 459, 462 (3d Cir.1987) ("[W]e find

precedent for extending the jurisdiction of the federal courts to include offenses [such as those with which Goldberg was charged, including wire fraud], wholly committed outside of this country, if the acts are intended to have an effect in the United States.").

In sum, the government's application to include Turner's foreign conduct in the guideline calculations under its inextricably intertwined theory is unconvincing, whether viewed alone or in conjunction with the impact rationale articulated in *Teyer.*

### 9. *Government's Jurisdictional Theories*

Attention will now be directed to the rationale underlying the government's jurisdictional theories, i.e. that the *Azeem* phrase, "crime against the United States," should be interpreted literally so that if Turner's defrauding of Knight, and multiple other foreign investors from various countries throughout the world, could have been prosecuted in the United States, the conduct under discussion is, by definition, a "crime against the United States" not only for jurisdictional, but also for sentencing purposes.

During oral argument on November 19, 2008, I asked the prosecutor "does the government contend that the defrauding of . . . non-U.S. individuals, including Dr. Knight, constituted a crime against the United States [referring to the second *Azeem* factor]?" (Nov. 19, 2008 Tr. at 13.) To that inquiry, she replied:

"My answer to that is yes, and it is because of my interpretation of what the circuit means [again, referencing, the *Azeem* phrase "crime against the United States"]. . . . It will be the government's position if the United States has juris-

diction over the offense, it would be a crime on the United States.

(*Id.* at 13–14.)

This alternate government theory, i.e. its jurisdictional argument, has, as noted earlier, been bifurcated in its presentation. The first part consists of the claim that Turner's use of a New York correspondent bank "to move ... money from Australia to the Bahamas," standing alone, would be sufficient to prosecute him under § 1343 for defrauding his foreign victims, with the second part being that the use of the correspondent bank, supplemented by, inter alia, the commingling of the foreign and domestic monies realized from the Ponzi scheme to perpetuate the scheme, more than satisfies the "crime against United States" *Azeem* requirement. (*Id.* at 12.) The two parts of this bifurcated argument will be addressed seriatim. Before doing so, however, the following preliminary matters will be discussed: (a) the meaning of the term "crime against the United States," (b) relevant parts of the law of wire fraud generally, and (c) the cases cited by the government in support of its jurisdictional theories.

(a) *The Term "Crime Against the United States" Should be Interpreted to Mean That That if Foreign Conduct Could Have Been Prosecuted Here Such Conduct Satisfies the Second Part of the Azeem § 1B1.3(a)(2) Standard*

■ In *Azeem* and *Chunza–Plazas,* as well as in *Teyer, Dawn* and *Farouil,* the overseas conduct was so clearly foreign in character that no elaboration of the term "crime against the United States" was required or given. As a result, its meaning may be debatable. But given the apparent absence of any precedent, it seems to me the term should be interpreted literally, i.e. precisely as it is written. *Cf. Greer,*

285 F.3d at 179–80. Granted, the Circuit explained in *Azeem* that the Congress in approving the Guidelines assigned a limited role to foreign crimes, which role did not embrace their inclusion in guideline calculations under § 1B1.3. However, if foreign conduct constitutes "a crime against the United States," those activities lose their solely overseas significance and should be considered as relevant conduct if part of the same course of conduct or common scheme as the counts of conviction. *Cf. Greer,* 285 F.3d at 179–80 ("[T]he crimes in this case [, unlike the Pakistan to Cairo transaction in *Azeem* ] are not foreign crimes; the MDLEA is a United States criminal statute that specifically covers conduct outside the United States.").

(b) *Relevant Parts of the Law of Wire Fraud Generally*

Section 1343, entitled "Fraud by Wire, Radio, or Television" reads in pertinent part as follows:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire ... in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both....

18 U.S.C. § 1343.

■ The essential elements of wire fraud are "(1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the ... wires[ ] to further the scheme." *Fountain v. United States,* 357 F.3d 250, 255 (2d Cir.2004). The defendant need not personally use the wires because the term in § 1343 "trans-

mits or causes to be transmitted" has been interpreted to mean that "one causes a wire transmission when he act[s] with knowledge that the use of the wires would follow in the ordinary course of business, or if such use could reasonably have been foreseen." *United States v. Kim,* 246 F.3d 186, 190 (2d Cir.2001) (internal citation and quotation marks omitted). "To prove that interstate wire facilities were used in furtherance of a fraudulent scheme the government [is not required to show] that the wire transmission was an essential element [of the scheme], but simply that it was for the purpose of executing the scheme." *United States v. Ford,* 603 F.2d 1043, 1047 (2d Cir.1979) (internal citation omitted). A use of the wires after the underlying scheme to defraud has been accomplished falls outside the ambit of § 1343. *See United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974).[18]

However, the goal of the scheme has not necessarily been realized for purposes of § 1343 because the wrongdoer has the illicit proceeds in hand. *See Schmuck v. United States,* 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989) (Schmuck, a used car wholesaler was convicted of mail fraud based on "an ongoing fraudulent venture" of selling cars to retailers with rolled-back odometers, *id.* at 711, 109 S.Ct. 1443; the mailings found to be adequate by the Supreme Court for purposes of § 1341 consisted of re-registration forms sent by the ultimate purchasers of the vehicles to the motor vehicle department with the Court explaining "although the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetu-

ation of Schmuck's scheme," *id.* at 712, 109 S.Ct. 1443).

### (c) *Cases Cited by Government in Support of its Jurisdictional Theories*

The three cases cited by the government during oral argument on November 19, 2008 in support of its jurisdictional positions are *Kim,* 246 F.3d 186, *United States v. Trapilo,* 130 F.3d 547 (2d Cir.1997), and *United States v. Gilboe,* 684 F.2d 235 (2d Cir.1982).

Kim was an employee of the United Nations in New York. While on an overseas assignment in Croatia, he concocted a scheme to submit inflated travel invoices to his employer's New York office. The implementation of that scheme required transmitting the bogus invoices to New York and the receipt thereafter of funds from New York. On appeal, Kim argued that the district court lacked jurisdiction over his case "because none of his conduct, or that of his co-conspirators, occurred in the United States and the wire fraud statute under which he was prosecuted was not intended to apply to an entirely foreign fraud." *Kim,* 246 F.3d at 188. That argument was rejected, with the Circuit initially noting that the Congress amended § 1343 in 1956 specifically for the purpose of including the term "foreign commerce," thereby making it clear that the statutory prohibition extended to communications between countries such as those triggered by Kim's actions. Given that *Kim* involved a United States citizen defrauding his United States based employer partially through the use of domestic telecommunication systems, the Circuit concluded that his wire fraud conviction rested on sound jurisdictional footing.

---

**18.** The statute in *Maze* was 18 U.S.C. § 1341, the mail fraud statute, not § 1343. However, the elements of mail fraud and wire fraud are essentially the same and are analyzed in the same way. *United States v. Trapilo,* 130 F.3d 547, 552 n. 7 (2d Cir.1997).

Trapilo and his co-defendants developed a scheme to defraud Canada of excise tax revenues. While operating in upstate New York, they placed large liquor orders "through interstate telephone calls, facsimiles, and wire transmissions" to a wholesaler in Maryland. *Trapilo,* 130 F.3d at 549. After taking delivery of the product, defendants "transported the liquor across the St. Lawrence River and into Canada, avoiding Canadian customs" and the obligation to pay the taxes due to that jurisdiction. *Id.*

The district court had dismissed the indictment, "conclud[ing] that it could not determine whether the defendants had the requisite intent to defraud without first passing on the validity of foreign revenue law," *id.* at 551, an exercise, the district judge believed, would have run afoul of the "revenue rule," i.e. a rule which "bars suit in one country to enforce another country's tax laws." *Pasquantino v. United States,* 544 U.S. 349, 373, 125 S.Ct. 1766, 161 L.Ed.2d 619 (2005); *see also Trapilo,* 130 F.3d at 550 for more complete explanation of the revenue rule.

In reversing, the Circuit explained:

These cases teach [referencing precedent, primarily in the Second Circuit], as the statute plainly states, what is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property. Nothing more is required. The identity and location of the victim, and the success of the scheme, are irrelevant.

*Trapilo,* 130 F.3d at 552 (emphasis omitted).

Gilboe was a citizen of Norway and resident of Hong Kong employed as the general manager of a Hong Kong ship brokerage firm. In that capacity, he misrepresented to a Chinese corporation that he had ships available to transport grain,

thereupon the parties entered into a contract for that purpose. Defendant then "obtained [the necessary] ships through negotiations with the Manhattan office of a shipowner, using telex and telephone communication channels." *Gilboe,* 684 F.2d at 237. The grain was to be loaded and transported via two ships, one from Argentina and the other from the United States.

When the grain was loaded in Argentina, the Chinese corporation paid defendant a sum in excess of $600,000 as required under their contract. From that account, "defendant was supposed to pay the shipowner 90% of the agreed freight due." *Id.* But instead of paying the shipowner, defendant transferred the bulk of the money "to a bank in the Bahamas using the Manhattan branch of Barclays Bank International." *Id.*

With respect to the shipments from the United States, defendant engaged in the same practice, this time routing the monies received from the Chinese corporation "through Manhattan banks to accounts in the Bahamas." *Id.* at 238.

Following his conviction, Gilboe argued that the district court lacked jurisdiction over the offense charged "because he was a nonresident alien whose acts occurred outside the United States and had no detrimental effect within the United States." *Id.* at 237. In rejecting that argument, the Circuit noted that "jurisdiction under § 1343 [wa]s satisfied by defendant's use of the wires to obtain the proceeds of his fraudulent scheme" at the expense of the shipowners and Chinese corporation. *Id.* at 238.

In addition to the three cases cited by the government there are a number of other cases of interest, the most important of which is *Pasquantino,* 544 U.S. 349, 125 S.Ct. 1766. Pasquantino was convicted of

violating § 1343 by engaging in essentially the same scheme as Trapilo and his cohorts, previously discussed.[19] Akin to Trapilo, Pasquantino "while in New York, ordered liquor over the telephone from discount package stores in Maryland." *Id.* at 353, 125 S.Ct. 1766. His drivers then drove to Maryland, picked up the product, and returned to New York. Some of the liquor remained in New York, with the remainder being shipped into Canada without "paying [the required excise taxes] by hiding the liquor in their vehicles and failing to declare the goods to Canadian customs officials." *Id.*

The central issue before the Supreme Court in *Pasquantino,* like before the Second Circuit in *Trapilo,* involved the "revenue rule" and whether § 1343 should be applied to frauds directed at evading foreign taxes.[20] After answering that threshold question in the affirmative, the Court turned its attention to Justices Ginsberg's and Breyer's criticism in dissent that the majority opinion "ascribed an exorbitant scope to the wire fraud statute, in disregard of [the Court's] repeated recognition that 'Congress legislates against the backdrop of the presumption against extraterritoriality.'" *Id.* at 373, 125 S.Ct. 1766 (citations omitted). To that criticism, Justice Thomas, delivering the majority opinion, responded:

> [O]ur interpretation of the wire fraud statute does not give it 'extraterritorial effect.' Petitioners used U.S. interstate wires to execute a scheme to defraud a foreign sovereign of tax revenue. Their offense was complete the moment they

executed the scheme inside the United States . . . .

*Id.* at 371, 125 S.Ct. 1766 (internal citation omitted).

In the concluding paragraph of the majority opinion, the Court notes the jurisdictional breadth of § 1343.

> It may seem an odd use of the Federal Government's resources to prosecute a U.S. citizen for smuggling cheap liquor into Canada. But the broad language of the wire fraud statute authorizes it to do so, and no canon of statutory construction permits us to read the statute more narrowly. The judgment of the Court of Appeals is affirmed.

*Id.* at 372, 125 S.Ct. 1766.

(d) *The Government's Jurisdictional Theory Based Solely on Transfer of Funds Through a New York Correspondent Bank is Insufficient to Establish That Turner's Foreign Conduct Constitutes a Crime Against the United States*

■ It is undisputed that a New York correspondent bank was involved in the transfer of funds from an Australian bank to a bank in the Bahamas at about the time defendant closed shop in the former jurisdiction after being called to task by the ASIC for supposedly marketing securities without a license. The use of the correspondent bank was necessary given that the Australian bank did not have an account with its Bahamian counterpart whereas the correspondent bank had a relationship with both. Through a series of electronically made debits and credits,

---

**19.** Certiorari was granted in *Pasquantino* to resolve a circuit split between the Second Circuit's holding in *Trapilo* and the First Circuit's contrary holding in *United States v. Boots,* 80 F.3d 580, 587 (1st Cir.1996) (holding that a scheme to defraud a foreign nation of tax revenue does not violate the wire fraud statute).

**20.** Parenthetically, the gist of the revenue rule argument unsuccessfully advanced in *Pasquantino* was that, as a practical matter, "the recovery of taxes [wa]s indeed the object of [the] suit, because restitution of the lost revenue to Canada [was] required under the Mandatory Victims Restitution Act of 1996, 18 U.S.C. §§ 3663A–3664." *Pasquantino,* 544 U.S. at 365, 125 S.Ct. 1766.

the funds were transferred into Turner's account in the Bahamas. Turner's involvement in the process ended upon his asking the Australian bank to initiate the process. (*See generally* Nov. 14, 2008 Tr. at 33–35 for the positions of the parties as to the agreed-upon role of the correspondent bank.)

It also appears to be undisputed that Turner initiated the fund transfer from Australia to the Bahamas. Merely because the points of origination and destination were outside of the United States does not render the transfer per se beyond § 1343's proscription. *Cf. Goldberg,* 830 F.2d 459. And from *Gilboe* we know that similarly not fatal to a wire fraud prosecution is the foreign location of both the victim and the defendant. However, for the transfer to be criminal, it had to be related to, and in furtherance of the scheme to defraud. *Schmuck,* 489 U.S. at 710–11, 109 S.Ct. 1443; *Maze,* 414 U.S. at 399–400, 94 S.Ct. 645; *United States v. Fermin Castillo,* 829 F.2d 1194 (1st Cir. 1987); *United States v. McNeill,* 728 F.2d 5, 14–15 (1st Cir.1984). On the information provided, that seems to be generally the case in that a continuation of the ongoing scheme required defendant to extricate his funds from Australia and the problems he faced there for use in his then new site of operations. However, to the extent individuals were defrauded prior to Turner's first use of American wires, does *Maze,* as previously discussed, preclude the corresponding losses from being included for guideline calculation purposes? [21]

The core issue as to the government's transfer jurisdictional theory based solely on Turner's use of a New York correspondent bank to move his funds from Austra-

lia to the Bahamas is encapsulated in the following oral argument excerpt:

MR. NEVILLE [defense counsel]: And I say that's [i.e. the fund transfer from Australia and the Bahamas through a New York correspondent bank] not enough of a nexus to give this Court jurisdiction. And I couldn't find any case law that would support the government's argument [and presumably none that would refute it either].

THE COURT: So it's a question of the sufficiency of the nexus rather than the presence or absence of the nexus?

MR. NEVILLE: I think we have to say that, yes.

(Nov. 14, 2008 Tr. at 35.)

Query: Would the subject wire transfer be sufficient to sustain a prosecution under § 1343 assuming a concomitant scheme to defraud vis-a-vis one or more of Turner's foreign victims?

Although the matter is certainly not free from doubt, I think the answer to that question is "no." That single nexus under the first scenario of the government's two-pronged jurisdictional argument is insufficient. Absent the additional factors embodied in the government's alternate jurisdictional argument—such as Turner's commingling and use of domestic and foreign monies in the Ponzi scheme— the reed proffered by the government is simply too thin.

In reaching that conclusion, I recognize that the Second Circuit over thirty years ago in *Gilboe* held that wire fund transfers consisting simply of " 'electronic crediting and debiting' " constituted " 'money' " for purposes of a prosecution based on 18 U.S.C. § 2314 which prohibits, inter alia, transfers in interstate or foreign com-

---

21. The issues underlying the above question, and some others broached both *supra* and *infra* in the text, have not been addressed by the parties nor previously raised by the Court *sua sponte.* To the extent the parties have not been heard on such issues, I will hear counsel at the *Fatico* hearing or, in some instances, prior thereto via written submissions as directed later in this opinion.

merce of funds obtained by fraud. *Gilboe,* 684 F.2d at 238. However, that determination was made in the context of a significant domestic concern, to wit, Gilboe's need "to move funds rapidly out of reach of disgruntled [Manhattan] shipowners who were to receive payment within days of loading the grain." *Gilboe,* 684 F.2d at 238; *see also id.* at 237 indicating that the defrauded parties included "Manhattan shipowners." Also in *Goldberg,* the Third Circuit, as noted earlier, underscored the impact that the foreign conduct was intended to produce domestically. *Goldberg,* 830 F.2d at 462. Here, Turner's defrauding of Knight and other foreign investors was not aimed at, nor did it cause any harm in the United States. And independent of Turner's later defrauding of Americans, our interest in Turner, who throughout the scheme's existence operated abroad as a foreign citizen and resident, was nonexistent.

I also considered the following, earlier quoted excerpt from *Trapilo*:

[A]s the statute plainly states, what is proscribed is use of the telecommunication systems of the United States in furtherance of a scheme whereby one intends to defraud another of property. Nothing more is required. The identity and location of the victim ... are irrelevant.

130 F.3d at 552 (emphasis omitted).

That portion of the *Trapilo* holding obviously dovetails with the concomitant facts. But those facts entail the placing of orders for liquor "through interstate telephone calls, facsimiles and wire transmissions" from upstate New York, not the incidental use of a correspondent bank in effecting a transfer between two foreign countries. *Id.* at 549. Similarly, *Kim,* another jurisdictional case relied upon by the government, did not involve peripheral contact, through a correspondent bank or otherwise, with our telecommunication systems.

Moreover, the Supreme Court in *Pasquantino* responded to the dissent's concern about the "extension of the 'wire fraud' statute ... to a scenario extraterritorial in significant part [although the statute is s]ilent on its application to activity culminating beyond our borders," *Pasquantino,* 544 U.S. at 372, 125 S.Ct. 1766, by explaining that "our [i.e. the majority opinion] interpretation of the wire fraud statute does not give it 'extraterritorial effect[ ]' " [because defendants'] "offense was complete the moment they executed the scheme inside the United States." *Id.* at 371, 125 S.Ct. 1766. That scheme, hatched and implemented in upstate New York, involved "telephone calls between New York and Maryland." *Id.* at 373, 125 S.Ct. 1766.

If the extraterritorial scope of § 1343 were as categorical as the government contends and as a non-contextual reading of the above quote from *Trapilo* suggests, presumably the Supreme Court would have simply indicated that the identity and location of the victim is irrelevant for purposes of § 1343 rather than providing the explanation that it did. *See generally* Ellen S. Podgor, *A New Dimension to the Prosecution of White Color Crime: Enforcing Extraterritorial Social Harms,* 37 McGeorge L.Rev. 83, 92 (2006) ("The *Pasquantino* decision also does not resolve whether extraterritorial concerns can be considered in cases involving the application of federal statutes to social harms that occur outside the United States. Although it alluded to wire fraud having an extraterritorial application because of the language of the statute including the words 'interstate or foreign commerce,' it also noted that the issue of extraterritoriality is a novel theory of a two-person dissent on an issue that the government did not have the opportunity to brief."). And finally there is nothing to my knowledge to suggest that the Congress in enacting § 1343, and amending the statute in 1956 to explicitly

cover foreign commerce, intended for its application to situations in which the sole domestic contact consists of a transfer between two foreign countries essentially ricocheting off the United States via the happenstance of a domestic correspondent bank being involved. Given that literally thousands, if not millions of such domestic correspondent bank contacts occur daily, a determination that such use, alone, if coupled with a foreign scheme to defraud, could constitute a predicate for a § 1343 prosecution, would extend the extraterritorial reach of the statute exponentially without any corresponding interest of the United States being advanced. It is not surprising that none of the cases cited by the parties or by in-chambers research has uncovered a reported decision in which jurisdiction has been claimed, no less established, on grounds comparable to those urged by the government under its first jurisdictional argument.

In sum, the government's argument that the defendant's transfer of funds from Australia to the Bahamas through a New York correspondent bank is per se sufficient to make his defrauding of foreign investors prosecutable under § 1343 is found to be without merit. However, the situation is otherwise when the government's proffer regarding the commingling of funds and subsequent use of those funds is factored into the analysis.

(e) *Government's Jurisdictional Theory Based on Transfer Through New York Correspondent Bank Plus, Inter Alia, the Commingling and Use of Funds From Domestic and Foreign Investors Thereafter, is Sufficient to Establish That Turner's Conduct Constitutes a Crime Against the United States, Assuming the Disputed Facts are as the Prosecution has Represented*

■ The government's previously provided listing of the claimed nexus between defendant's domestic and foreign activities (*supra* at 214–15), submitted primarily with respect to its inextricably intertwined theory, was found to be inadequate to support that theory. However, several of those items, when viewed in conjunction with the involvement of a United States correspondent bank in the fund transfer from Australia to the Bahamas, compels a different result.

It appears that Turner's scheme began in the late 1990s in Australia and moved to the Bahamas in 2000. (Feb. 16, 2006 Stip. as to Knight's Testimony ¶¶ 6 to 9). "In October 2000, Turner solicited his first victim in the United States," using the same *modus operandi.* (Gov't's Aug. 8, 2008 Letter Br. at 12.) The counts of conviction for the three American John Does cover the period from February 2001 to April 16, 2005.

The entry of Americans into the victim ranks beginning in late 2000 altered the scheme from one solely involving extraterritorial concerns to one implicating significant domestic interests as well. To the extent funds derived from American victims were utilized to, among other things, make distributions to foreign victims and vice versa, we, as a nation, have a legitimate interest in protecting our residents against Turner's conduct. The same may be said of Turner's use of commingled funds in the Bahamas to compensate United States sales personnel marketing his scheme domestically. In each instance, the conduct abroad was intended to have effects in the United States. As such, that conduct considered together with Turner's use of a New York correspondent bank to transfer funds from Australia to New York, would be prosecutable under § 1343 thereby satisfying *Azeem's* "crime against the United States" standard. *See*

*Goldberg*, 830 F.2d at 462 ("[W]e find precedent for extending the jurisdiction of the federal courts to include offenses, wholly committed outside of this country, if the acts committed are intended to have an effect in the United States.") and *United States v. Braverman*, 376 F.2d 249, 251 (2d Cir.1967) ("Braverman knew, when he cashed the money orders [at a money exchange firm in Brazil] and gave Miranda two ..., that he was putting them into foreign commerce because, of necessity, they had to be ultimately paid in Brooklyn, New York.").

Indeed, defendant seemingly does not dispute the above conclusion if it is assumed that the government's proffer represents reality. But, the defense maintains, such is far from the case. Thus, in responding to the government's commingling argument, defense counsel stated: "Your Honor, I think the government's argument would hold water if it were true. I think factually the government is misrepresenting what occurred here." (Nov. 14, 2008 Tr. at 22–23.) That leads us to the next section of this opinion. For purpose of addressing the first two unsuccessful theories put forth by the government, viz. inextricably intertwined and jurisdiction predicated on the transfer of funds alone, I assumed, arguendo, the facts to be as the prosecution has represented. So construed, the government's arguments still fell short of the mark. However, for the government to prevail on its transfer plus jurisdictional theory, it must establish that its rendition of the pivotal facts is accurate.

### 10. Government's Burden of Proof as to § 1B1.3(a)(2) Under its Transfer Plus Jurisdictional Theory

The government has the burden of establishing by a fair preponderance of the evidence that defendant's foreign conduct should be included as relevant conduct under § 1B1.3(a)(2). To meet that burden under its transfer plus jurisdictional theory, the government should be prepared to prove at a *Fatico* hearing the following:

(1) with respect to each foreign victim the government seeks to have included in the guideline calculations: (a) that such person was indeed a "victim" under our law and the law of the relevant foreign jurisdiction,[22] (b) that such victimization was part of the same course of conduct or common scheme as the counts of conviction, (c) the amount of loss sustained, adjusted for the exchange rate, together with an explanation of the date used in making that calculation, and (d) why Knight's loss and that of other foreign investors said to have been defrauded prior to Turner transferring funds from Australia to the Bahamas should be included in the guideline calculations;

(2) that the defendant brought about the transfer of funds from Australia to the Bahamas through a correspondent bank in the United States (*see* the government's factual proffer, item "a", *supra* at 214–15);[23]

(3) that the monies obtained by defendant from foreign and domestic victims were commingled after his operation expanded to include United States investors (*see id.* item "c", *supra* at 215);

---

**22.** Fed. R.Crim. Proc. 26.1 provides: "A party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice. Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence."

**23.** As stated earlier in the text, this item is not in dispute.

(4) the commissions were paid from commingled funds to sales personnel in the United States perpetrating the scheme domestically (*see id.* item "d", *supra* at 215); and

(5) that the commingled funds, given the nature of the ongoing Ponzi scheme, resulted in monies obtained from domestic victims being applied towards payments to foreign investors and vice versa (*see id.* item "h", *supra* 215).[24]

Some of the other items contained in the government's list of factual proffers are relevant for present purposes because, if established, they provide further support for its transfer plus jurisdictional theory. Included within that category are items "b" (foreign victims sending monies to the Bahamas through United States correspondent banks), "e" (pertaining to Turner's trading room in the Bahamas having plasma screens leased from Bloomberg in the United States using commingled funds), and "g" (pertaining to Turner having investment brochures manufactured in the Eastern District of New York, again paid for with commingled funds).[25] In addition, scores of wire fund transfers occurred between the United States and the Bahamas and vice versa "between the period of February, 2003 to December 9, 2004," further buttressing this government theory. (Def.'s Oct. 30, 2008 Letter Br. at 4–5.)

The circumstances leading to the transfer of funds from Australia to the Bahamas via a New York correspondent bank may also be germane to the extent the government seeks to have the number of foreign victims, and their associated losses included in the guideline calculations. *Maze* instructs that if a scheme to defraud has fully run its course before the mailing relied upon by the government occurs, the mailing is not sufficient to establish a violation of § 1341. However, if the wire transfer here occurred to prevent Knight and other early investors from discovering Turner's wrongdoing and/or recovering their outlays pursuant to his purported agreement with the ASIC to repay all his investors,[26] or for some other reason geared to a continuation of the fraud, then a different result would presumably follow.

It must be remembered that the foreign conduct must be criminal to be relevant for § 1B1.3(a)(2) purposes. *See supra*, n. 2. Such conduct need not only be criminal under our laws, but also under the laws of the country where the acts occurred. *See Azeem*, 946 F.2d at 17 ("Were a global approach required, we would soon find it necessary to determine the appropriate evidence that must be produced by the prosecution to show that the activity occurred and that it violated foreign law."), and *Goldberg*, 830 F.2d at 462 ("[T]he general and almost universal rule is that the character of an act as lawful or unlawful must

---

24. Heretofore in the text, the initial subdivisions of each numbered section of the opinion has been designated by letters beginning with "a". However for this subdivision, viz. "10", I have used numbers "1" through "5" because otherwise the cross-references to the earlier presented listing of government's factual proffers is difficult to follow.

25. With respect to item "f" pertaining to Turner establishing a trading account in November 2000 at R.J. O'Brien in Chicago with monies realized from his fraudulent scheme,

the government acknowledged during oral argument, as previously noted, that that account played no role in advancing the scheme. Accordingly the funding of that account has no more relevance for § 1B1.3(a)(2) purposes than if Turner, for instance, had used the ill-gotten proceeds to buy an automobile in the United States.

26. (*See* Gov't's Aug. 8, 2008 Letter Br. at 2 for a more complete explanation of the government's understanding of what supposedly transpired between defendant and the ASIC.)

be determined wholly by the law of the country where the act is done.").[27]

### CONCLUSION

For the reasons indicated:

(1) the Court agrees with the government's position advanced during oral argument that if Turner's foreign conduct could have been prosecuted domestically given the breadth of § 1343, then the *Azeem* requirement of such foreign conduct being a crime against the United States is satisfied for purposes of § 1B1.3(a)(2);

(2) the Court rejects the government's argument that foreign conduct should be considered under § 1B1.3(a)(2) because the foreign and domestic portions of the scheme are allegedly inextricably intertwined, as well as the government's theory urging the same result based solely on Turner's transfer of funds from Australia to the Bahamas via a New York correspondent bank; and

(3) the Court accepts the government's "transfer plus jurisdictional theory," as earlier explained, subject to possible revisiting or modification (a) should the government not prove at a *Fatico* hearing one or more of the items listed in paragraph 10 *supra*, entitled "Government's Burden of Proof as to § 1B1.3(a)(2) Under its Transfer Plus Jurisdictional Theory," and/or (b) based on the Court's resolution of the open, heretofore unaddressed issues identified *supra*.

The most significant of the previously unaddressed issues is whether the Trailing Clause of § 1B1.3(a)(1) should be included in applying § 1B1.3(a)(2) as the Second Circuit indicated in *Fitzgerald*. As to that issue, as well as the question concerning victims defrauded prior to the fund transfer from Australia to the Bahamas, each party shall submit its position by June 5, 2009, with any responses to the other's submission being due on June 26, 2009. Those issues shall be the subject of oral argument and decision on July 9, 2009. Thereafter an updated Presentence Report will be ordered and a resentencing date set.

SO ORDERED.

---

**27.** *Foreign conduct, if it was prosecutable here, need not mirror the counts of conviction to be relevant under § 1B1.3(a)(2) as long as such wrongdoing is proven to be part of the same scheme or course of conduct as the counts of conviction. Thus, for example, if a foreign victim was not induced to invest via a* mailing or wire, unlike his or her domestic counterparts—as defendant suggests was true of Knight (*see* item "d" of "Defendant's Position" *supra* at 216–17), that is not dispositive of the relevant conduct issue. *Cf. Fitzgerald*, 232 F.3d at 320.